KENNETH WASHINGTON ET AL. *v.* LARRY R.
MEACHUM, COMMISSIONER OF
CORRECTION
(15281)

Callahan, Borden, Berdon, Norcott and Palmer, Js.

Argued March 26—officially released August 6, 1996

*Philip D. Tegeler* and *Carl Riehl*, pro hac vice, with whom were *Brett Dignam* and, on the brief, *Martha Stone* and *J. L. Pottenger, Jr.*, for the appellants-appellees (plaintiffs).

*Stephen J. O'Neill*, assistant attorney general, with whom were *Henri Alexandre* and *Steven R. Strom*, assistant attorneys general, and, on the brief, *Richard Blumenthal*, attorney general, and *Jane R. Rosenberg*, assistant attorney general, for the appellee-appellant (defendant).

*Norman B. Teague* and *Syrie Davis Fried* filed a brief for the Connecticut Criminal Defense Lawyers' Association et al. as amici curiae.

CALLAHAN, J. This appeal arises from a class action filed by the plaintiffs,[1] inmates of Connecticut correctional institutions, against the defendant, Larry R. Meachum, the commissioner of the department of correction (department),[2] in his individual and official

---

[1] The plaintiffs are Kenneth Washington, David Copas, Paul Graziani and Lee MacClaine, Sr., on behalf of themselves and other sentenced prisoners and pretrial detainees housed in the state correctional institutions in Connecticut. Throughout this opinion we will refer to sentenced prisoners and pretrial detainees as inmates.

[2] In December, 1994, Meachum resigned as commissioner of the department and was succeeded by John J. Armstrong, who has been substituted as the defendant for purposes of declaratory and injunctive relief.

capacities, challenging certain department regulations governing inmate use of the telephone and mail systems within Connecticut correctional facilities. The plaintiffs appeal, claiming that the trial court improperly concluded that: (1) the department regulations permitting the monitoring and recording of nonprivileged inmate telephone calls (a) do not violate either the "eavesdropping statutes"; General Statutes §§ 53a-187 through 53a-189; or the "wiretapping statutes"; General Statutes §§ 54-41a through 54-41t; (b) do not violate the "HIV confidentiality statutes"; General Statutes §§ 19a-581 through 19a-592; and (c) do not violate article first, § 7, of the state constitution; and (2) the department regulations permitting the review of nonprivileged outgoing inmate mail do not violate the first and fourteenth amendments to the federal constitution. The defendant cross appeals, claiming that the trial court improperly ordered specific modifications to department practices regarding inmate telephone calls to attorneys.

On the appeal, we reject the plaintiffs' claims. On the cross appeal, we agree with the defendant. We therefore reverse the judgment in part.

The facts are undisputed. In the early 1990s, the defendant found that the "collect call only" telephones[3] in department facilities were periodically being used to further a variety of illegal activity including inmate escapes, drug trafficking, gang activity and assaults. In 1993, in order to detect and deter some of these activities, the defendant adopted the regulations that are now codified at §§ 18-81-28 through 18-81-51 of the Regula-

---

[3] Section 18-81-28 (a) of the Regulations of Connecticut State Agencies defines "collect call only" telephones as "telephones which allow for outgoing calls on a collect call basis only and which are available in areas specified by the Unit Administrator for inmate use." Such telephones are the only telephones that inmates may use to make outgoing nonprivileged calls.

tions of Connecticut State Agencies.[4] The regulations pertaining to telephone use provide that nonprivileged inmate telephone calls from collect call only telephones

[4] The relevant regulations provide as follows:

"Sec. 18-81-28. Definitions

"For the purposes stated herein, the following definitions apply as used in Sections 18-81-28 through 18-81-51 inclusive as follows:

"(a) 'Collect Call Only Telephones' means telephones which allow for outgoing calls on a collect call basis only and which are available in areas specified by the Unit Administrator for inmate use.

"(b) 'Contraband' means anything not authorized to be in an inmate's possession or anything used in an unauthorized or prohibited manner.

"(c) 'General Correspondence' means all correspondence not defined as privileged communication in Subsection (e) of this Section.

"(d) 'Inspection' means a physical and visual examination of the actual contents, which shall not include the reading of the correspondence.

"(e) 'Privileged Communication' means any telephone call placed on behalf of an inmate by the facility or any written correspondence addressed to or received from federal, state and local (e.g., municipal, county or town) elected and appointed officials, including but not limited to the following:

"(1) Any judge or court.

"(2) The Governor.

"(3) The Legislature.

"(4) The Attorney General.

"(5) The Commissioner of Correction or any Department official appointed by the Commissioner.

"(6) The Board of Parole.

"(7) The Sentence Review Board.

"(8) The Commission on Human Rights and Opportunities.

"(9) The State Claims Commissioner.

"(10) The Board of Pardons.

"(11) Elected Government officials.

" 'Privileged communication' shall also mean any telephone call placed on behalf of an inmate by the facility or any written correspondence addressed to or received from the Connecticut Correctional Ombudsman or attorneys. The word 'attorneys' shall include organizations providing legal services to inmates.

"(f) 'Publication' means a book (for example, novel, instructional manual), or a single issue of a magazine or newspaper, plus such other materials addressed to a specific inmate as advertising brochures, flyers and catalogues.

"(g) 'Recording and Listening' means the recording and listening, including electronic recording of the number(s) called, on-line listening, recording of inmate telephone conversations and subsequent listening to recordings of inmate telephone conversations.

"(h) 'Review' means a visual examination of an inmate's general correspondence, which may include, but shall not be limited to, reading the correspondence.

"(i) 'Unit' means an organizational component of the Department, subordinate to a Division or subdivision, administered by a Unit Administrator. A unit may be a correctional facility, a community service unit, or other special service unit.

"Sec. 18-81-29. Inmate communications

"Inmate communications by mail and by telephone may be inspected, reviewed, read, listened to, recorded, restricted, or prohibited in accordance with the provisions of Sections 18-81-28 through 18-81-51, inclusive, of the Regulations of the Connecticut State Agencies. . . .

"Sec. 18-81-31. Outgoing general correspondence

"(a) Review, Inspection and Rejection. All outgoing general correspondence shall be subject to being read at the direction of the Unit Administrator, by person(s) designated in writing by such Administrator, for either a specific inmate(s) or on a random basis if the Commissioner or Unit Administrator has reason to believe that such reading is generally necessary to further the substantial interests of security, order or rehabilitation. Outgoing general correspondence may be restricted, confiscated, returned to the inmate, retained for further investigation, referred for disciplinary proceedings or forwarded to law enforcement officials, if such review discloses correspondence or materials which contain or concern:

"(1) The transport of contraband in or out of the facility.

"(2) Plans to escape.

"(3) Plans for activities in violation of facility or departmental rules.

"(4) Plans for criminal activity.

"(5) Violations of Sections 18-81-28 through 18-81-51, inclusive, of the Regulations of the Connecticut State Agencies or unit rules.

"(6) Information which if communicated would create a clear and present danger of violence and physical harm to a human being.

"(7) Letters or materials written in code.

"(8) Mail which attempts to forward unauthorized correspondence for another inmate.

"(9) Threats to the safety or security of staff, other inmates or the public. The initial decision to take any action provided for in this Subsection except to read, which shall be at the discretion of the Unit Administrator, shall be made by the designee of the Unit Administrator. Such designee shall not be the same person who made the initial mailroom review.

"(b) Notice of Rejection. In the event that the designee of the Unit Administrator determines that outgoing general correspondence shall not be sent as provided for above in Subsection (a) of this Section, the inmate sender shall be notified in writing of the correspondence rejection and the reason therefor. The inmate may seek review in writing within five (5) days thereafter from the Unit Administrator. The Unit Administrator shall notify the inmate of the final decision and the reason therefor in writing. In the event

such rejection results in referral for prosecution or investigation for violation of unit or department rules or of the criminal law, the notice of rejection may be delayed until the appropriate investigation is completed.

"(c) Limitations on Restrictions. Any restrictions imposed on outgoing general correspondence shall be unrelated to the suppression of expression and may not be restricted solely based on unwelcome or unflattering opinions or factually inaccurate statements.

"(d) Procedure for Mailing. Outgoing general correspondence shall be inserted into the envelope and sealed by the inmate but shall be subject to inspection, review and rejection subject to the provisions of Sections 18-81-28 through 18-81-51, inclusive, of the Regulations of the Connecticut State Agencies as set forth in Subsection (a) of this Section. All outgoing general correspondence shall include:

"(1) A complete legible name and address of the party the correspondence is being sent to.

"(2) The inmate's complete legible name, inmate number, and present unit address.

"(3) The name under which the inmate was committed to the facility or another name approved for official recognition. Correspondence which fails to include this information shall be returned, if reasonably practicable, to the inmate.

\* \* \*

"Sec. 18-81-41. Telephone access

"Each Facility Administrator shall provide 'collect call only' telephones which allow for outgoing calls in areas specified by the Unit Administrator for inmate use. Schedules and terms for telephone use shall be posted in telephone areas. Inmate use of 'collect call only' telephones shall be deemed a privilege and not an entitlement. Use of any telephone may be prohibited by the Facility Administrator to meet any valid penological interest. If the call is to an attorney, such prohibition shall be based upon a determination relating to the maintenance of security, safety or orderly operation of the facility. The availability or use of any telephones may be restricted or terminated at the discretion of the Commissioner or designee.

"Credit card calls, billing to a third party, call forwarding, transfers or any other method which circumvents collect call billing shall be prohibited. . . .

"Sec. 18-81-43. Emergency calls

"Any inmate upon approval, may be allowed to place an emergency call. Such calls shall be at state expense if the inmate is indigent.

"Sec. 18-81-44. Recording and listening to 'collect call only' telephone calls

"Only telephone calls from 'collect call only' telephones may be recorded and listened to provided the following provisions are complied with:

"(a) Notification. A sign in English and Spanish shall be posted at each inmate telephone location which reads: 'Any conversation utilizing these telephones shall be subject to recording and listening.'

"Upon admission, each inmate shall be given a form stating that the inmate's telephone calls are subject to recording and listening. The inmate

may be listened to and recorded with the authorization of the unit administrator[5] or higher authority when there

shall acknowledge reading the form by a legible printed name and signature or by an appropriate assent acknowledged in writing by a staff member. Any inmate not so consenting shall not be allowed use of the 'collect call only' telephones and shall be instructed that any such use shall be unauthorized and in violation of institutional rules.

"(b) Automatic Tone Warning. Inmate telephone calls shall be recorded in accordance with the provisions of Section 52-570d of the Connecticut General Statutes and any other applicable law. No call shall be recorded unless the recording is accompanied by an automatic tone warning device which automatically produces a distinct signal that is repeated at intervals of approximately 15 seconds during the communication while such instrument, device or equipment is in use.

"(c) Listening. Listening shall be authorized only by the Unit Administrator or higher authority when there is reason to believe that such listening is reasonably related to the maintenance of the security, good order or discipline of the facility or the prevention of criminal activity either within the facility or without. . . .

"Sec. 18-81-46. Privileged telephone calls

"An inmate shall be provided a reasonable accommodation to make prearranged non-recorded telephone calls to any person enumerated in Subsection (e) of Section 18-81-28 on non-collect call only telephones without the recording and/or listening provided for in Section 18-81-44 above, and provided the person enumerated in Subsection (e) of Section 18-81-28 called agrees to accept the charges. Such calls shall be placed by staff who shall verify the party's identity prior to placing the inmate on line. The staff member shall then move out of listening range of the inmate's conversation. The employee placing the call may maintain visual observation of the inmate. Such calls shall normally be limited to ten minutes duration.

\* \* \*

"Sec. 18-81-50. Notification

"Upon admission, each inmate shall be given a form which states, 'I have been advised that the Commissioner of Correction has adopted regulations pertaining to mail and telephone use and that these regulations are contained in Sections 18-81-28 through 18-81-51 of the Regulations of Connecticut State Agencies.' The inmate shall acknowledge reading the form by signature.

"Sec. 18-81-51. Disclosure of correspondence and/or telephone conversations

"Information obtained from correspondence and/or telephone calls by correctional staff, pursuant to the provisions of these regulations, shall be disclosed only as reasonably necessary to promote legitimate penological, law enforcement or public safety purposes."

[5] The unit administrator is the current equivalent of a warden, who administers the correctional institution.

is reason to believe that the surveillance is "reasonably related to the maintenance of the security, good order or discipline of the facility or the prevention of criminal activity either within the facility or without,"[6] and as long as the following methods of providing notice to the inmates, and to those parties whom the inmates call, are employed: (1) signs written in both English and Spanish must be posted at each telephone location notifying the inmates of the monitoring and recording of calls; (2) each inmate must read and sign a form before he or she uses the collect call only telephones that discloses that his or her conversations may be monitored; and (3) an automatic tone that can be heard at fifteen second intervals shall be used when an inmate's call is being recorded. Regs., Conn. State Agencies § 18-81-44. The regulation pertaining to outgoing mail provides that all outgoing "general correspondence"[7] may be read on a targeted or random basis "if the Commissioner [of Correction] or the Unit Administrator has reason to believe that such reading is generally necessary to further the substantial interests of security, order or rehabilitation." Regs., Conn. State Agencies § 18-81-31 (a). These provisions are modeled after similar regulations in effect in at least thirty-one other states as well as the District of Columbia, and also in federal prisons.

The trial court also found the following facts pertaining to telephone monitoring.[8] "As of April 27, 1994,

---

[6] The trial court found that it was fair to infer from the record that permission to monitor the collect call only telephones will be given by the unit administrator every week in every facility.

[7] "General correspondence" includes all correspondence that is addressed to someone other than a lawyer, a judge, a court, the Connecticut Correctional Ombudsman, the governor, the legislature, the attorney general, certain officials of the department of correction, the board of parole, the sentence review board, the commission on human rights and opportunities, the state claims commissioner, the board of pardons or an elected government official. Regs., Conn. State Agencies § 18-81-28 (c) and (e).

[8] The evidence adduced at trial pertaining to the review of outgoing mail was limited and the trial court made no specific findings of fact pertaining thereto.

the [department] had trained and authorized ninety persons to listen to monitored telephone calls. Eighty-nine of these were correctional personnel and one was a state trooper. In practice, however, monitoring is primarily done by only a few people at each facility. At [the Connecticut Correctional Institution, Somers (CCIS)], for example, the bulk of the listening is done by William Grady, the CCIS Intelligence Coordinator. Mr. Grady, who testified at some length, impressed me as a decent and honest person who took his job seriously and had no interest in listening to purely personal [tele]phone calls. He estimated that he devotes four or five hours a day to listening, primarily to target recorded listening. In addition, however, he does some random live listening every day. In his experience, the vast majority of calls that inmates make are normal calls. Depending on the luck of the draw, he can happen on a call that may appropriately be listened to—i.e., a call that affects prison order or security or involves criminal activity—on his first attempt or he can go for days without hitting one. He estimates that in the average month he comes across ten to twenty calls that are appropriate to listen to. Of these latter calls, the vast majority yield information that may appropriately be turned over to . . . correctional or law enforcement authorities, but a few do not. Target monitoring yields dramatically better results than random monitoring. . . . All persons authorized to listen to inmate telephone calls have been trained in the governing standards as required by § 18-81-45 [of the Regulations of Connecticut State Agencies]. They are emphatically instructed that it is inappropriate to listen to purely personal telephone calls. Mr. Grady takes this responsibility seriously. The [department] personnel who testified in this case exhibited a great deal of professionalism. In addition, there is no evidence either that any purely personal conversation has been listened to after being identified

as such or that any purely personal information overheard has been inappropriately disclosed."

The trial court also found the following facts regarding the effect of the telephone regulations on institutional security. "The Connecticut correctional officials who testified were unanimously of the opinion that the monitoring done pursuant to the [r]egulation[s]—and especially the telephone monitoring—had made a unique contribution to institutional security. In their opinion, institutional disruptions had been deterred, law enforcement had been assisted, and contraband had been intercepted because of the monitoring. Copious reports have been submitted that leave no doubt that the monitoring has periodically resulted in the apprehension of criminals and of persons planning to violate institutional rules. In addition, although it cannot be proven, there can be little doubt that the highly publicized existence of the monitoring program has deterred other persons from using the collect call only telephones for illegal purposes."

I

The Plaintiffs' Appeal

The plaintiffs claim that the department regulations permitting department officials to monitor and record nonprivileged telephone calls between inmates and various members of the public violate both the eavesdropping statutes; General Statutes §§ 53a-187 through 53a-189;[9] and the wiretapping statutes. General Statutes

---

[9] The eavesdropping statutes provide:

"Sec. 53a-187. Definitions. Applicability. (a) The following definitions are applicable to sections 53a-188 and 53a-189: (1) 'Wiretapping' means the intentional overhearing or recording of a telephonic or telegraphic communication or a communication made by cellular radio telephone by a person other than a sender or receiver thereof, without the consent of either the sender or receiver, by means of any instrument, device or equipment. The normal operation of a telephone or telegraph corporation and the normal use of the services and facilities furnished by such corporation pursuant to

§§ 54-41a through 54-41t.[10] The plaintiffs concede, however, that the activities permitted by the regulations are fully consistent with the more recent recording statute,

its tariffs shall not be deemed 'wiretapping'. (2) 'Mechanical overhearing of a conversation' means the intentional overhearing or recording of a conversation or discussion, without the consent of at least one party thereto, by a person not present thereat, by means of any instrument, device or equipment. (3) 'Unlawfully' means not specifically authorized by law. For purposes of this section, 'cellular radio telephone' means a wireless telephone authorized by the Federal Communications Commission to operate in the frequency bandwidth reserved for cellular radio telephones.

"(b) This section and sections 53a-188 and 53a-189 shall not apply to wiretapping by criminal law enforcement officials in the lawful performance of their duties and do not affect the admissibility of evidence in any proceedings other than a prosecution for eavesdropping or tampering with private communications.

"Sec. 53a-188. Tampering with private communications: Class A misdemeanor. (a) A person is guilty of tampering with private communications when: (1) Knowing that he does not have the consent of the sender or receiver, he obtains from an employee, officer or representative of a telephone or telegraph corporation, by connivance, deception, intimidation or in any other manner, information with respect to the contents or nature of a telephonic or telegraphic communication; or (2) knowing that he does not have the consent of the sender or receiver, and being an employee, officer or representative of a telephone or telegraph corporation, he knowingly divulges to another person the contents or nature of a telephonic or telegraphic communication.

"(b) Tampering with private communications is a class A misdemeanor.

"Sec. 53a-189. Eavesdropping: Class D felony. (a) A person is guilty of eavesdropping when he unlawfully engages in wiretapping or mechanical overhearing of a conversation.

"(b) Eavesdropping is a class D felony."

[10] The relevant wiretapping statutes provide as follows:

"Sec. 54-41a. Definitions. The following words and phrases, as used in this chapter, shall have the following meanings, unless the context otherwise requires:

"(1) 'Wire communication' means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of telephone or telegraph between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of intrastate, interstate or foreign communications;

"(2) 'Intercept' means the intentional overhearing or recording of a wire communication through the use of any electronic, mechanical or other device;

"(3) 'Electronic, mechanical or other device' means any device or appara-

tus which can be used to intercept a wire communication other than (A) any telephone or telegraph instrument, equipment or facility, or any component thereof (i) furnished to the subscriber or used by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business, or (ii) being used by a communications common carrier in the ordinary course of its business, (B) a hearing aid or similar device being used to correct subnormal hearing to not better than normal;

"(4) 'Person' means any officer, agent or employee of the state of Connecticut or any political subdivision thereof, and any individual, partnership, association, joint stock company, trust, limited liability company or corporation;

"(5) 'Investigative officer' means (A) any officer of the Connecticut state police, (B) the chief inspector or any inspector in the division of criminal justice who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, (C) any municipal police officer who has been duly sworn as a special state police officer under the provisions of section 29-177 and who is currently assigned to the state-wide narcotics task force or the state-wide organized crime investigative task force and is acting under the direct authority of the Connecticut state police, and (D) any attorney authorized by law to prosecute or participate in the prosecution of offenses enumerated in this chapter;

"(6) 'Law enforcement officer' means any officer of any organized police department of this state or of the state police of any other state, an official of the Federal Bureau of Investigation, Drug Enforcement Administration or United States Customs Service, or the United States attorney for the district of Connecticut or a person designated by him in writing to receive the contents of any wire communication or evidence derived therefrom;

"(7) 'Contents,' when used with respect to any wire communication, means and includes any information concerning the identity of the parties to such communication or the existence, substance, purport or meaning of that communication;

"(8) 'Panel of judges' or 'panel' means any panel or panels of three superior court judges specifically designated by the chief justice of the supreme court from time to time to receive applications for, and to enter orders authorizing, interceptions of wire communications in accordance with the provisions of this chapter;

"(9) 'Communication common carrier' means any person engaged as a common carrier for hire in the transmission of communications by wire or radio;

"(10) 'Aggrieved person' means a person who was a party to any intercepted wire communication, a person against whom the interception was directed, a person named in any order authorizing an interception, or a person having a property interest in any premises involved in any interception.

"Sec. 54-41b. Application for order authorizing interception. The chief

state's attorney or the state's attorney for the judicial district in which the interception is to be conducted may make application to a panel of judges for an order authorizing the interception of any wire communication by investigative officers having responsibility for the investigation of offenses as to which the application is made when such interception may provide evidence of the commission of offenses involving gambling, bribery, violations of section 53-395, violations of section 21a-277 or felonious crimes of violence.

"Sec. 54-41c. Information in application. Each application for an order authorizing the interception of a wire communication shall be made in writing upon oath or affirmation to a panel of judges. Each application shall include the following information: (1) The identity of the applicant and his authority to make such application; (2) the identity and qualifications of the investigative officers or agency for whom the authority to intercept a wire communication is sought; (3) the identity and qualifications of the investigative or law enforcement officers to whom disclosure of the contents of any intercepted wire communication or evidence derived therefrom might be made; (4) a statement of the use to which the contents of any intercepted wire communication or any evidence derived therefrom will be put; (5) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his reasonable belief that the wire communication of a particularly described person will constitute evidence of a crime enumerated in section 54-41b that has been or is being committed or that such communication will materially aid in the apprehension of the perpetrator of such crime and that an order should be issued, including (A) details as to the particular offense that has been or is being committed, (B) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (C) a particular description of the type of communications sought to be intercepted, (D) the identity of the person, if known, who has committed or is committing the offense and whose communications are to be intercepted, (E) the time and date when the facts and circumstances relied upon by the applicant were first received by him or by the investigative or law enforcement officer conducting the investigation, whichever is earlier, (F) the way in which the intercepted wire communication will constitute material evidence of the particularly described offense or will materially aid in the apprehension of the perpetrator of such offense, (G) the hours of the day or night during which wire communication may be reasonably expected to occur; (6) a full and complete statement of facts showing that other normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ; (7) a statement of the period of time for which the interception is required to be maintained. No order authorizing or approving the interception of a wire communication shall be issued if the facts and circumstances relied upon by the applicant were discovered more than twenty days next preceding the date of the application. If the nature of the investigation is such that

the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter; (8) a full and complete statement of the facts concerning all previous applications known to the individual making the application, made to any panel of judges, for authorization to intercept, or for approval of interceptions of, wire communications involving any of the same persons, facilities or places specified in the application, and the action taken by the panel on each such application; (9) a statement that the wire communications sought are material to a particularly described investigation or prosecution and that such communications are not legally privileged; (10) if it is reasonably necessary to make a secret entry upon a private place or premises in order to install an intercepting device to effectuate the interception, a statement to that effect and to the effect that no practicable alternative method of executing the order which will preserve the secrecy of its execution exists; (11) where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results; (12) where the application is for an order authorizing interception in excess of thirty-five orders previously issued by all panels in a calendar year, a statement setting forth the nature of the emergency situation which may result in imminent peril to the public health, safety or welfare, and the nature of that imminent peril, which requires the issuance of an additional interception order. The state's attorney shall inform the governor and the joint standing committee of the general assembly having cognizance of matters relating to criminal law and procedure of the nature of the emergency situation which may result in imminent peril to the public health, safety or welfare, and the nature of that imminent peril; (13) such additional testimony or documentary evidence in support of fact in the application as the panel of judges may require. Allegations of fact in the application may be based either upon the personal knowledge of the applicant or upon information and belief. If the applicant personally knows the facts alleged, it must be so stated. If the facts establishing such probable cause are derived in whole or part from the statements of persons other than the applicant, the sources of such information and belief shall be either disclosed or described, and the application shall contain facts establishing the existence and reliability of the informant, or the reliability of the information supplied by him. The application shall also state the basis of the informant's knowledge or belief. If the applicant's information and belief are derived from tangible evidence or recorded oral evidence, a copy or detailed description thereof shall be annexed to or included in the application. Affidavits of persons other than the applicant may be submitted in conjunction with the application if they tend to support any fact or conclusion alleged therein. Such accompanying affidavits may be based either on personal knowledge of the affiant, or information and belief with the source thereof and reason therefor specified.

\* \* \*

"Sec. 54-41k. Service of notice of interception; inspection of intercepted communications, applications and orders; postponement of service. Within a reasonable time but not later than ninety days next succeeding the termination of the period of an order or extensions thereof, the issuing or denying panel may cause to be served on the persons named in the order or the application, and shall cause to be served on persons not named in the order or application whose communications were intercepted, an inventory which shall include notice of the fact of the entry of the order or the application; the date of the entry and the period of authorized interception, or the denial of the application; and the fact that during the period wire communications were or were not intercepted. The panel shall make available to such person or his counsel for inspection the intercepted communications, applications and orders immediately upon the filing of a motion requesting such information. On an ex parte showing of good cause approved unanimously by the panel the serving of the inventory required by this section may be postponed for a period not to exceed sixty days. Not more than one such postponement shall be authorized and under no circumstances shall the serving of the inventory required by this section be made later than one hundred fifty days after the termination of the period of an order or extensions thereof.

\* \* \*

"Sec. 54-41p. Disclosure of contents of wire communication. Unauthorized disclosure: Class D felony. (a) Any investigative officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire communication, or evidence derived therefrom, may, if specially authorized by the order authorizing the interception of such communication, disclose such contents to any investigative or law enforcement officer designated in such order to the extent that such disclosure is appropriate to the conduct of the investigation specified in the application for such order.

"(b) Any person who has received, by any means authorized by this chapter, any information concerning a wire communication, or evidence derived therefrom, intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence insofar as it relates to the crimes set forth in section 54-41b while giving testimony under oath or affirmation in any criminal proceeding before any court or grand jury.

"(c) If an investigative officer, while engaged in the interception of wire communications in accordance with the provisions of this chapter, intercepts wire communications relating to any crime not specified in the order authorizing such interception, the contents of such intercepted communications and evidence derived therefrom may be disclosed as otherwise provided in subsection (a).

"(d) Any investigative officer who discloses the contents of any intercepted wire communication or evidence derived therefrom (1) to any person not authorized to receive such information or (2) in a manner otherwise than authorized by the provisions of this chapter shall be guilty of a class

General Statutes § 52-570d.[11]

Before addressing the plaintiffs' claims, it is useful to trace the history of the legislation regarding the moni-

D felony.

\* \* \*

"Sec. 54-41t. Unauthorized or illegal interception: Class C felony. Any investigative officer who intercepts the wire communications of any person in violation of the provisions of this chapter shall be guilty of a class C felony."

[11] "[General Statutes] Sec. 52-570d. Action for illegal recording of private telephonic communications. (a) No person shall use any instrument, device or equipment to record an oral private telephonic communication unless the use of such instrument, device or equipment (1) is preceded by consent of all parties to the communication and such prior consent either is obtained in writing or is part of, and obtained at the start of, the recording, or (2) is preceded by verbal notification which is recorded at the beginning and is part of the communication by the recording party, or (3) is accompanied by an automatic tone warning device which automatically produces a distinct signal that is repeated at intervals of approximately fifteen seconds during the communication while such instrument, device or equipment is in use.

"(b) The provisions of subsection (a) of this section shall not apply to:

"(1) Any federal, state or local criminal law enforcement official who in the lawful performance of his duties records telephonic communications;

"(2) Any officer, employee or agent of a public or private safety agency, as defined in section 28-25, who in the lawful performance of his duties records telephonic communications of an emergency nature;

"(3) Any person who, as the recipient of a telephonic communication which conveys threats of extortion, bodily harm or other unlawful requests or demands, records such telephonic communication;

"(4) Any person who, as the recipient of a telephonic communication which occurs repeatedly or at an extremely inconvenient hour, records such telephonic communication;

"(5) Any officer, employee or agent of any communication common carrier who in the lawful performance of his duties records telephonic communications or provides facilities to an investigative officer or criminal law enforcement official authorized pursuant to chapter 959a to intercept a wire communication;

"(6) Any officer, employee or agent of a Federal Communications Commission licensed broadcast station who records a telephonic communication solely for broadcast over the air;

"(7) Any officer, employee or agent of the United States Secret Service who records telephonic communications which concern the safety and security of the President of the United States, members of his immediate family or the White House and its grounds; and

"(8) Any officer, employee or agent of a Federal Communications Commission broadcast licensee who records a telephonic communication as part of

toring of telephone conversations. In 1969, the legislature enacted as part of our Penal Code; Public Acts 1969, No. 828; the eavesdropping statutes, now codified at General Statutes §§ 53a-187 through 53a-189. General Statutes § 53a-189 (a) provides: "A person is guilty of eavesdropping when he unlawfully engages in wiretapping or mechanical overhearing of a conversation." The definitional section, § 53a-187, provides that listening to or recording a conversation constitutes "wiretapping" or "mechanical overhearing" only when it is done without the consent of one of the parties to the conversation. General Statutes § 53a-187 (a) (1) and (2). Section 53a-187 (a) (3) provides that such conduct is "unlawful" only when it is not specifically authorized by law. Section 53a-187 (b) contains an exemption for criminal law enforcement officials acting in the lawful performance of their duties.

In 1971, the legislature, in seeking to regulate the conduct of the law enforcement officials whom it specifically had exempted from the eavesdropping statutes two years earlier, enacted the wiretapping statutes. Public Acts 1971, No. 68. General Statutes § 54-41b provides that "[t]he chief state's attorney or the state's attorney for the judicial district in which the interception is to be conducted may make application to a panel of judges for an order authorizing the interception of any wire communication by investigative officers having responsibility for the investigation of offenses as to which the application is made when such interception may provide evidence of the commission of offenses involving gambling, bribery, violations of section 53-395, violations of section 21a-277 or felonious crimes of violence."

a broadcast network or cooperative programming effort solely for broadcast over the air by a licensed broadcast station.

"(c) Any person aggrieved by a violation of subsection (a) of this section may bring a civil action in the superior court to recover damages, together with costs and a reasonable attorney's fee."

The balance of the wiretapping statutes is dedicated primarily to describing, in explicit detail, the procedural requirements accompanying a request for permission to intercept a communication in this state. General Statutes §§ 54-41c through 54-41o.

In addition to the procedural requirements, the wiretapping statutes also provide for certain criminal sanctions against the unauthorized disclosure or receipt of information derived from intercepted communications by investigative officers. General Statutes § 54-41p (d) criminalizes the unauthorized disclosure of any information received via an intercepted wire communication, by providing that "[a]ny investigative officer who discloses the contents of any intercepted wire communication or evidence derived therefrom (1) to any person not authorized to receive such information or (2) in a manner otherwise than authorized by this chapter shall be guilty of a class D felony." General Statutes § 54-41t makes it a class C felony for "[a]ny investigative officer [to intercept] the wire communications of any person in violation of the provisions of this chapter . . . ." For purposes of the wiretapping statutes, the term "investigative officer" includes only Connecticut state police officers, certain inspectors of the division of criminal justice, municipal police officers who are assigned to the statewide narcotics task force or the statewide organized crime investigative task force, and certain state's attorneys. General Statutes § 54-41a (5).

In 1990, the legislature adopted the recording statute, § 52–570d, in an effort to strengthen the privacy protections afforded to Connecticut's citizens. It required that recording by officials not involved in law enforcement be done with the knowledge of both parties. Public Acts 1990, No. 90-305. Then Senator Richard Blumenthal described the purpose of the bill that would become the recording statute. He stated: "The effect of this bill . . . would be to prohibit tape-recorded conversations

unless done by the knowledge of *all* parties to those telephonic conversations. Currently, under law, the telephone conversation can be taped with the knowledge of one party [to] the conversation." (Emphasis added.) 33 S. Proc., Pt. 5, 1990 Sess., p. 1415. The bill exempted 911 emergency calls, emergency situations and certain situations involving law enforcement. In order to ensure that all parties to a monitored conversation would be aware that it was being monitored, the legislature provided that no call could be recorded unless the recording: "(1) is preceded by consent of all parties to the communication and such prior consent either is obtained in writing or is part of, and obtained at the start of, the recording, or (2) is preceded by verbal notification which is recorded at the beginning and is part of the communication by the recording party, or (3) is accompanied by an automatic tone warning device which automatically produces a distinct signal that is repeated at intervals of approximately fifteen seconds during the communication while such instrument, device or equipment is in use." General Statutes § 52-570d (a). The plaintiffs concede that the department regulations at issue comply with the recording statute in that each party to a telephone call made from the collect call only telephones in state correctional institutions is provided by the department with notice of the potential monitoring and recording of their conversations. The plaintiffs argue, however, that despite this compliance with the recording statute, the department's practices violate the eavesdropping and wiretapping statutes. We disagree with the plaintiffs and conclude that neither the eavesdropping statutes nor the wiretapping statutes are applicable to situations in which both parties to the call being overheard have notice that the call may be monitored and recorded.

A

The plaintiffs first claim that the department regulations violate the eavesdropping statutes, §§ 53a-187 through 53a-189. We disagree.

As noted previously, the eavesdropping statutes proscribe monitoring and recording of telephonic communications only if the monitoring and recording is done without the consent of at least one party to the call. The plaintiffs argue that the type of "consent" required by the eavesdropping statutes is akin to the constitutional type of consent that we require in areas such as search and seizure. Such a standard embodies more than mere knowledge and implicates notions of free will and meaningful choice. In arguing against the notion that the term "consent" as used in the eavesdropping statutes requires only that one of the parties to the conversation have knowledge of the recording, the plaintiffs assert that "[t]here is no indication in the legislative history of the eavesdropping statute[s] that the drafters of the statute[s] anticipated a situation . . . in which the participants in a telephone conversation know that the conversation is being recorded or listened to but do not consent to the recording or listening." That assertion is particularly interesting in light of the official commentary to the Penal Code, which states that the eavesdropping statutes are intended to address "*surreptitious* overhearing or recording of a telephonic or telegraphic communication" and that their reach was intended to be "limit[ed] . . . to situations in which the speakers had no reason to know that they could or might be overheard."[12] (Emphasis added.) Commission to Revise the Criminal Statutes, Penal Code Comments, Connecticut General Statutes, pp. 73–74 (1971). We conclude that the eavesdropping statutes are violated only when neither party to the call knows that the call is being monitored. Because, under the department regulations and in compliance with the recording statute,

---

[12] This interpretation of the consent exception to the eavesdropping statutes is supported by the comment, in 1990, of Senator Blumenthal, who emphasized that, under the existing law, "telephone conversation[s] could be taped with the knowledge of one party [to] the conversation." 33 S. Proc., Pt. 5, 1990 Sess., p. 1415.

both parties to conversations on the collect call only telephones in the state's correctional institutions must be provided with notice before the call commences, we conclude that the eavesdropping statutes have not been violated by the department regulations.

B

The plaintiffs also claim that the department regulations pertaining to the monitoring and recording of telephone calls violate the wiretapping statutes. General Statutes §§ 54-41a through 54-41t. We conclude, however, that the wiretapping statutes, like the eavesdropping statutes, were intended to apply only to *surreptitious* monitoring by "investigative officers"[13] and were not intended to apply to those situations covered by the recording statute where both parties are provided with notice that the call may be monitored. Because our goal in construing statutes is to "ascertain and give effect to the apparent intent of the legislature"; (internal quotation marks omitted) *In re Sheldon G.*, 216 Conn. 563, 568, 583 A.2d 112 (1990); we reject the plaintiffs' argument.

We previously have held that a recording of a telephone call where one party to that conversation is a police officer or informant is not a violation of the wiretapping statutes because those statutes were intended to cover only surreptitious recording. *State* v. *Grullon*, 212 Conn. 195, 209, 562 A.2d 481 (1989). This conclusion is supported by two provisions of the statu-

---

[13] Although the wiretapping statutes apply only to "investigative officers" and do not include department employees within that group, the plaintiffs point out that on eight occasions the department has recorded certain inmate conversations at the request of the police. The plaintiffs argue that compliance with these requests created an agency relationship and that the statutes thus were applicable to the department as an agent of the police even if department officials are not otherwise covered. We need not address this claim because of our conclusion that the eavesdropping statutes are not violated by the department personnel in the circumstances of this case.

tory scheme. General Statutes § 54-41c (10) provides that, if "it is reasonably necessary to make a secret entry upon a private place or premises in order to install an intercepting device to effectuate the interception, a statement to that effect and to the effect that no practicable alternative method of executing the order which will preserve the secrecy of its execution exists" shall be included in an application for an order authorizing a wiretap. Moreover, General Statutes § 54-41k authorizes the three judge panel that issued the interception order to provide notice of the interception to all persons named in the order whose conversations have been overheard, and requires that panel to disclose the fact of the interception to all persons not named in the order whose conversations have been overheard. Such notice would be wholly unnecessary if the parties had been aware of the monitoring at the time of the conversation. Both of these provisions evince the obvious fact that the wiretapping statutes were not intended to apply in those circumstances where, as here, all parties to the conversation are made aware that their conversation is being monitored.

The legislative history further supports our conclusion. Senator Joseph Fauliso, one of the most vocal opponents of the wiretapping statutes, stated that if the wiretapping statutes were to be passed by the legislature, "every telephone user would have to conjure the possibility that the phantom hands of the electronic eavesdropper could be clutching the very instrument into which he speaks. . . . In my judgment, it is enough that the law permits the interception of telephone conversations with the permission of the caller or the receiver. And it is at this point that we should draw the line." 14 S. Proc., Pt. 2, 1971 Sess., pp. 876–77. Senator Lawrence J. DeNardis, another opponent of the 1971 wiretapping legislation, also spoke of fears inherent in a society where people are afraid to speak on the

telephone for fear that a wiretap may be in use: "A friend of mine, visiting Moscow a few years ago, by a series of accidents became very friendly with a group of young people there, young radicals who were disenchanted with the regime. Serious conversations were always held in the park and communications in his hotel room once, w[ere] by passing notes back and forth. The paranoia that infected these people was at least as distressing as the reality." 14 S. Proc., Pt. 2, 1971 Sess., p. 891. These and other similar comments in the legislative history confirm our conclusion that the wiretapping statutes were intended to apply only to monitoring and recording done without the knowledge of either party to the conversation. The wiretapping statutes are not violated when both parties to a conversation are provided extensive notice of the monitoring and recording, as is the case under department regulations.

### C

The plaintiffs' final statutory claim is that the department regulations pertaining to the monitoring and recording of nonprivileged telephone calls violate General Statutes § 19a-583, which provides in relevant part that, except in specified circumstances, "[n]o person who obtains confidential HIV-related information may disclose, or be compelled to disclose, such information." The plaintiffs argue that those inmates who are HIV positive are compelled by department regulations to disclose confidential HIV information. We disagree.

Those inmates who are HIV positive are not "compelled" to disclose any information pertaining to their condition to any party. The dictionary defines "compel" as "to drive or urge forcefully or irresistibly" and "to cause to do or occur by overwhelming pressure."[14] Web-

---

[14] In order to ascertain the plain meaning of a word, it is appropriate to look to the dictionary definition. See *Wrinn* v. *State*, 234 Conn. 401, 406, 661 A.2d 1034 (1995) (employing dictionary definition); *Aetna Life & Casualty Co.* v. *Bulaong*, 218 Conn. 51, 61–62, 588 A.2d 138 (1991) (same); *Robert*

ster, Collegiate Dictionary (10th Ed.). Moreover, in interpreting a rental agreement, we have previously concluded that "[t]he word 'compelled,' in its ordinary sense, means: to drive or urge with force; to constrain; oblige; necessitate, whether by physical or moral force." *Ains* v. *Hayes*, 92 Conn. 130, 133, 101 A.2d 579 (1917).

As the trial court concluded, "[t]hese authorities confirm what common sense dictates in any event. [General Statutes] § 19a-583 (a) is violated only where real physical or moral compulsion from an external source is placed on a person who has obtained confidential HIV-related information to disclose that information. The evidence here fails to establish that the [department] has created any sort of coercion, legal or factual. The only 'compulsion' to disclose [HIV-related information] that the plaintiffs can identify is an internal compulsion that compels them to disclose their erstwhile confidential information to others over the telephone. The protected individual himself is specifically entitled to disclose such information by General Statutes § 19a-583 (b)." We cannot conclude that any inmate has in any sense been compelled by department regulations either to use a monitored telephone or to disclose any HIV-related information over such a telephone line.[15] We therefore conclude that § 19a-583 is not violated by department regulations.

D

We next address the constitutionality of certain provisions contained in the regulations. The plaintiffs contend that under article first, § 7, of our state

*S. Weiss & Associates, Inc.* v. *Wiederlight*, 208 Conn. 525, 534–35, 546 A.2d 216 (1988) (same).

[15] We note that the legislature has recognized the unique problems inherent in a prison facility as they pertain to HIV positive inmates and has provided, in certain circumstances, for involuntary testing of inmates; General Statutes § 19a-582 (e) (6) and (7); as well as for the disclosure of an inmate's HIV positive status. General Statutes § 19a-583 (a) (9).

constitution, inmates have a privacy right to unmonitored nonprivileged telephone calls from the correctional facility. No such right has previously been found to exist in any jurisdiction in the country under either the federal constitution or any state constitution, and we find no support for the proposition that the Connecticut constitution confers such a right.

When determining whether our state constitution affords Connecticut citizens greater individual liberties than its federal counterpart, we consider, to the extent applicable, six factors: "(1) the text of the [relevant] constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of our constitutional forebears; and (6) contemporary understandings of applicable economic and sociological norms. *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992)." *State* v. *Ross*, 230 Conn. 183, 249, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995).

Under the federal constitution, it is well settled that inmates completely forgo certain of their constitutional rights and may be restricted in their exercise of certain other rights. See *Hudson* v. *Palmer*, 468 U.S. 517, 524, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984) ("imprisonment carries with it the circumscription or loss of many significant rights"); *Bell* v. *Wolfish*, 441 U.S. 520, 545–46, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) ("[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system" [internal quotation marks omitted]). "The curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of institutional needs and objectives of prison facilities, *Wolff* v. *McDonnell*, [418 U.S. 539, 555, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974)], chief among which is internal security, see *Pell* v. *Procunier*, [417

U.S. 817, 823, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974)]. Of course, these restrictions or retractions also serve, incidentally, as reminders that, under our system of justice, deterrence and retribution are factors in addition to correction." (Internal quotation marks omitted.) *Hudson* v. *Palmer*, supra, 524. Of those rights that have been curtailed in the prison setting, the fourth amendment right to privacy is one of the most commonly and severely curtailed. See *United States* v. *Roy*, 734 F.2d 108, 111 (2d Cir. 1984), cert. denied, 475 U.S. 1110, 106 S. Ct. 1520, 89 L. Ed. 2d. 918 (1986) (legitimate privacy expectations "severely curtailed" during incarceration); *Christman* v. *Skinner*, 468 F.2d 723, 726 (2d Cir. 1972) (monitoring detainees' conversations with visitors not violative of privacy right); *State* v. *Ruan*, 419 N.W.2d 734, 737 (Iowa App. 1987) ("society accepts that '[l]oss of freedom of choice and privacy are inherent incidents of confinement' "). For example, under the federal constitution, security concerns have been held to justify strip and body-cavity searches; see *Bell* v. *Wolfish*, supra, 558–60; *Weber* v. *Dell*, 804 F.2d 796, 802 (2d Cir. 1986); and wholly random cell searches. See *Block* v. *Rutherford*, 468 U.S. 576, 589–91, 104 S. Ct. 3227, 82 L. Ed. 2d 438 (1984); *Hudson* v. *Palmer*, supra, 530 ("[f]ourth amendment's prohibition on unreasonable searches [and seizures] does not apply in prison cells").

The courts applying the federal constitution have consistently concluded that whatever limited privacy rights inmates retain do not include a right to make unmonitored, non-privileged telephone calls. *United States* v. *Workman*, 80 F.3d 688, 694 (2d Cir. 1996) ("[o]nly a single participant in a conversation need agree to the monitoring in order to satisfy the requirements of the Fourth Amendment" and inmate use of prison telephone with knowledge of monitoring practice constitutes such agreement); *United States* v. *Sababu*, 891 F.2d 1308, 1329 (7th Cir. 1989) (outsider who telephones

inmate has no reasonable expectation that conversation will be private because " '[i]n prison, official surveillance has traditionally been the order of the day' "); *United States* v. *Willoughby*, 860 F.2d 15, 20–21 (2d Cir. 1988); *United States* v. *Amen*, 831 F.2d 373, 379–80 (2d Cir. 1987), cert. denied sub nom. *Abbamonte* v. *United States*, 485 U.S. 1021, 108 S. Ct. 1573, 99 L. Ed. 2d 889 (1988); *United States* v. *Paul*, 614 F.2d 115 (6th Cir. 1980); *United States* v. *Clark*, 651 F. Sup. 76, 81 (M.D. Pa. 1986) (distinguishing monitoring of public telephone booth from monitoring of jailhouse telephone on grounds that there is no reasonable expectation of privacy in jailhouse conversation); *Teat* v. *State*, 636 So. 2d 697, 699 (Ala. Crim. App. 1993) ("there is no reasonable expectation of privacy in the telephone conversations of inmates at penal institutions"); *State* v. *Fox*, 493 N.W.2d 829, 832 (Iowa 1992) (no fourth amendment violation even though inmate not specifically notified of monitoring).

The jurisdictions that have considered the privacy rights of inmates under their respective state constitutions similarly have concluded that those rights, to the extent that they exist, are severely limited. See, e.g., *State* v. *Melendez*, 168 Ariz. 275, 276, 812 P.2d 1093 (Ariz. App. 1991) ("a prisoner does not have constitutional rights to privacy in his prison cell"); *State* v. *Guirlando*, 509 So. 2d 172, 174 (La. App. 1987) (inmate has no legitimate expectation of privacy with respect to items within his cell); *Commonwealth* v. *McCollins*, 23 Mass. App. 436, 438–39, 503 N.E.2d 55 (1987) (same); *State* v. *Berard*, 154 Vt. 306, 317, 576 A.2d 118 (1990) (warrantless, random cell search permissible where conducted pursuant to reasonable written guidelines and without any "arbitrary conduct or any particularized unfairness"). In cases in which other state courts have applied the independent provisions of their state constitutions to privacy claims pertaining specifically

to prison telephone conversations, those courts unanimously have found that the monitoring or taping of such conversations does not violate the implicit or explicit privacy protections of their respective state constitutions. *People* v. *Myles*, 62 Ill. App. 3d 931, 936, 379 N.E.2d 897 (1978) (no reasonable expectation of privacy in jailhouse conversations, despite explicit privacy provision in state constitution, because "[a] phone maintained in a jail for prisoner use shares none of the attributes of privacy of a home or automobile or even a public phone booth"); *State* v. *Fischer*, 270 N.W.2d 345, 354 (N. Dak. 1978) ("parties to a jailhouse conversation usually have no reasonable expectation of privacy due to the security needs of maintaining order and of limiting the introduction of contraband, such as drugs, into the jail" unless deceptive actions of law enforcement officials provide such reasonable expectation). Despite the majority of courts that have considered the same or similar claims under both the federal constitution and other state constitutions and have rejected such claims, the plaintiffs maintain that they nonetheless should prevail under the independent provisions of article first, § 7, of the state constitution based on the four remaining *Geisler* factors. We are not persuaded.

The text of article first, § 7, contains no indication that the framers of our constitution intended it to provide greater protection of inmate privacy rights than the fourth amendment to the federal constitution. The texts of the two provisions are virtually identical.[16] *State*

---

[16] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirma-

v. *Miller*, 227 Conn. 363, 381, 630 A.2d 1315 (1993). There is nothing in the text of article first, § 7, that warrants an expansive view of its protection when applied to prison inmates.

Moreover, the history of our penal institutions not only fails to support the claim that the state constitution was intended by its creators to vest Connecticut inmates with enhanced privacy rights, it squarely contradicts it. The trial court aptly summarized the nature of Connecticut correctional institutions in 1818, when article first, § 7, was adopted, as follows: "When the constitution of 1818 was adopted, the state prison was Newgate. (Wethersfield prison did not open until 1827.) Newgate, as is well known, was a hellhole. Its prisoners were housed in a copper mine in what would today be considered truly barbaric conditions. A vivid description of this dungeon is set forth in *State* v. *Ellis*, 197 Conn. 436, 452–53 n.15, 497 A.2d 974 (1985) [on appeal after remand sub nom. *State* v. *Paradise*, 213 Conn. 388, 567 A.2d 1221 (1990)].[17] The prisoners living in it

tion, and particularly describing the place to be searched, and the persons or things to be seized."

[17] In *Ellis*, we described the conditions at Newgate as follows: " 'The passage down the shaft into the caverns, is upon a ladder fastened upon one side, and resting on the bottom. At the foot of this passage commences a gradual descent for a considerable distance, all around being solid massive rock or ore. . . . In two of the passages are deep wells of water, one of which is eighty feet from the surface; they served for a free circulation of air to the inmates of this gloomy place, and were sometimes used for shafts through which to lift the ore, when the business was carried on. On the sides and niches of the cavern, cabins were built of heavy planks, within which straw was placed for their beds. . . . The horrid gloom of this dungeon can be realized only by those who pass among its solitary windings. The impenetrable vastness supporting the awful mass above, impending as if ready to crush one to atoms: the dripping water trickling like tears from its sides; the unearthly echoes responding to the voice, all conspire to strike the beholder aghast with amazement and horror. . . . During the day the guard was changed once in two hours, at the sound of a horn, and in the night a guard entered the caverns every hour and a half, and counted the prisoners. The punishments inflicted for offences and neglect of duty were severe flogging, confinement in stocks in the dungeon, being fed on bread

were 'heavily ironed, and secured by both hand-cuffs and fetters.' 1 Edward Augustus Kendall, Travels Through the Northern Parts of the United States (1809) p. 210. As Kendall put it, '[p]risoners in this gaol are treated precisely as tigers in a menagerie.' Id., p. 215."[18]

Despite this grim picture of the sole operating Connecticut prison in 1818, the plaintiffs claim that such a picture "do[es] not establish a complete lack of privacy for inmates. Indeed our founding fathers might well have been shocked by the types of searches described 160 years later in *Bell* v. *Wolfish*, [supra, 441 U.S. 520 (strip and body cavity searches)]." To provide support for their conjecture about the intent of our forebears, the plaintiffs rely on *Grumon* v. *Raymond*, 1 Conn. 39 (1814). In that case, we declared it improper for the defendant, a justice of the peace acting in response to

and water during the time, double or treble sets of irons, hanging by the heels, &c., all tending to inflame their revenge and hatred . . . .' Phelps, Newgate of Connecticut (1876) pp. 59–60, 67.

" 'Newgate "embodied in its general management the ideas of the time in which it flourished—harsh mediaeval ideas, with little consideration of the sources of sin, and less sympathy with the sinner." . . . It was an eighteenth-century philosophy . . . well-suited to "the happy faculty possessed by the Puritan of that period, of devising places of unearthly punishment to correspond with the future provided in his theology . . . .' " D'Amato, Newgate to Wethersfield: The Development of Prison Reform In Early Nineteenth-Century Connecticut (1972) pp. 9–10 (unpublished masters thesis, Trinity College; Connecticut State Library, Hartford, Connecticut), quoting Start, 'The New England Newgate,' The New England Magazine, III (N.S.) (November, 1890) pp. 366, 367–68." *State* v. *Ellis*, supra, 197 Conn. 452–53 n.15.

We detail the conditions at Newgate prison only to refute the plaintiffs' argument that our state history supports an expansive reading of article first, § 7, in the area of prison inmates' rights. We do not adopt Newgate as a model by which to judge the constitutionality of prison conditions in our state.

[18] The trial court also pointed out that, in 1818, even ardent contemporary supporters of prison reform such as Jeremy Bentham did not conceive that inmates would be afforded privacy rights even approaching those of the general public. In Bentham's Panopticon (1791) p. 24, he proposed a circular prison monitored from above by a supervisor in a central tower in order that the inmates "should always feel themselves as if under inspection."

a complaint regarding the theft of two bags valued at one dollar, to have issued a general warrant that commanded certain officials " 'forthwith diligently to search the premises of Aaron Hyatt in said Wilton, and other suspected places, houses, stores or barns in said Wilton, for said bags, and also to search such persons as are suspected; and if you shall find said bags and the person suspected, you are to take said bags, and arrest the person suspected . . . .' " Id., 41.

We fail to see how *Grumon,* the first of many published opinions by this court disapproving of the issuance of general warrants affecting the privacy rights of members of the public, supports the plaintiffs' argument. *Grumon* cannot conceivably be read to extend broader privacy rights to *inmates* under the Connecticut constitution than under the federal constitution. First, *Grumon* did not involve inmates or their privacy rights. Second, general warrants were expressly forbidden by the fourth amendment to the federal constitution as of December 15, 1791, upon ratification of the bill of rights. See *Stanford* v. *Texas,* 379 U.S. 476, 481, 85 S. Ct. 506, 13 L. Ed. 2d 431 (1965) (plain language of fourth amendment "reflect[s] the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant"). It is unclear how *Grumon,* a Connecticut case that merely adopted a position stated in the federal constitution, can be said to lend any support to the plaintiffs' argument that article first, § 7, provides greater privacy rights to inmates than the fourth amendment. The conditions at Newgate at the time the constitution of 1818 was ratified, combined with the lack of any evidence suggesting that Connecticut had or has a different view of the privacy protections to be afforded to incarcerated persons, lead us to reject the plaintiffs'

claim that Connecticut's history supports their proposed reading of the state constitution to prohibit monitoring and recording of inmates' nonprivileged telephone calls.

We next turn to our own precedents. In previous privacy cases, we have interpreted article first, § 7, to require a determination of whether the party claiming an infringement of his or her privacy right has manifested a subjective expectation of privacy and, if so, whether that expectation is one that society is prepared to recognize as reasonable. *State* v. *Joyce*, 229 Conn. 10, 20, 639 A.2d 1007 (1994); *State* v. *DeFusco*, 224 Conn. 627, 633, 620 A.2d 746 (1993). Whether the particular expectation of privacy at issue here, namely, an inmate's expectation that his or her nonprivileged telephone calls will be unmonitored and unrecorded, is an expectation that we, as a society, are prepared to recognize as reasonable, is an issue of first impression under our state constitution. All of the previous claims that have come before this court involving the constitutional rights of those in the custody of the commissioner of correction have been decided solely under the federal constitution. *State* v. *Smith*, 207 Conn. 152, 165–66, 540 A.2d 679 (1988) (probationer has diminished expectation of privacy); *Roque* v. *Warden*, 181 Conn. 85, 434 A.2d 348 (1980) (rejecting inmate's claim that disciplinary measures taken against him violated his first amendment rights even though similar discipline of unincarcerated individual would have been unconstitutional); see *State* v. *Blades*, 225 Conn. 609, 619, 626 A.2d 373 (1993) (recognizing that in certain situations privacy concerns " 'must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life' ").[19] There is, therefore, no Connecticut precedent supporting the plaintiffs' position.

---

[19] The plaintiffs urge us to rely on the Appellate Court's decision in *Board of Pardons* v. *Freedom of Information Commission*, 19 Conn. App. 539,

Moreover, assuming that the plaintiffs' have a subjective expectation of privacy in their non-privileged telephone calls, we conclude that such an expectation is not one that the citizens of our state would recognize as reasonable. The general law of privacy attendant upon incarceration, and the recognized need for institutional security, clearly do not legitimize such an expectation.

We turn last to contemporary understandings of applicable economic and sociological norms. As in *State v. Ross,* supra, 230 Conn. 251, we look to the legislative determinations of other states for guidance pertaining to the current social mores nationwide. Thirty-three jurisdictions, including thirty-one states, the Federal Bureau of Prisons and the District of Columbia, all have in place some system of monitoring of inmates' telephone calls. These legislative determinations nationwide are supported by the overwhelming weight of judicial authority across the country that concludes that the monitoring of inmates' communications is a necessary and constitutional method of ensuring the

542–43, 563 A.2d 314, cert. denied, 212 Conn. 819, 565 A.2d 539 (1989). In that case, the Appellate Court upheld the trial court's reversal of a freedom of information commission determination that certain personal information pertaining to applicants appearing before the board of pardons must be made public. The Appellate Court's determination was based solely on the statutory requirements of our Freedom of Information Act, which was designed, in part, to protect from disclosure information that might harm an individual and which the Appellate Court found "does not provide that prisoners who petition for pardons have no right to privacy with respect to exempted materials under [General Statutes] § 1-19 (b) (2)." Id., 544. The court determined that the disclosure of personal information pertaining to inmates would result in the endangerment of human life and therefore was protected from disclosure under the state Freedom of Information Act. We fail to see how the Appellate Court's determination that the legislature intended that certain personal information pertaining to prisoners should be kept confidential from the public lends any support to the plaintiffs' claim pertaining to the state constitutional right to privacy as it applies to inmate nonprivileged telephone calls, particularly where there is no evidence in the record that any information gathered was disclosed to the public.

institutional security of our prisons, and deterring inmates from continuing on a course of criminal conduct once they are incarcerated.

In sum, consideration of the six factors that we traditionally have considered when determining whether the protections afforded by the Connecticut constitution are greater than those afforded by the federal constitution persuades us that article first, § 7, of our state constitution does not provide inmates with a greater degree of privacy than does the federal constitution. The inmates of Connecticut's correctional institutions, therefore, have no reasonable expectation of privacy in their nonprivileged telephone calls and those calls may be monitored and recorded. The department regulations pertaining to nonprivileged inmate telephone calls are therefore consistent with article first, § 7, of our state constitution.

### E

The plaintiffs also claim that the department regulation permitting the reading of inmates' nonprivileged outgoing mail violates the first and fourteenth amendments to the federal constitution.[20] The department regulations provide that all outgoing "general correspondence"; Regs., Conn. State Agencies § 18-81-28 (c), see footnote 7; shall be subject to being read either on a targeted or random basis "if the Commissioner [of Correction] or the Unit Administrator has reason to believe that such reading is generally necessary to further the substantial interests of security, order or rehabilitation." Regs., Conn. State Agencies § 18-81-

---

[20] In their initial brief, the plaintiffs make reference to a claim under article first, § 7, of the Connecticut constitution but do not provide any independent analysis under that provision. We therefore decline to review the state constitutional claim. See *State* v. *Barnes*, 232 Conn. 740, 744 n.4, 657 A.2d 611 (1995).

31 (a).[21] We conclude that the plaintiffs' claim is without merit.

In *Procunier* v. *Martinez*, 416 U.S. 396, 405, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974), the United States Supreme Court recognized the expertise of prison officials and that the judiciary is "ill equipped to deal with the increasingly urgent problems of prison administration," and emphasized that courts should afford "deference to the appropriate prison authorities." The court held that "any regulation or practice that restricts [outgoing] inmate correspondence must be generally necessary to protect one or more of the legitimate governmental interests identified above." Id., 414. The interests to which the court referred were "security, order, and rehabilitation." Id., 413. Although the United States Supreme Court has recognized since *Martinez* that, when prison regulations affect outgoing mail, as opposed to incoming mail, there must be a "closer fit between the regulation and the purpose it serves," it has also reiterated that in neither case must the regulation satisfy a "least restrictive means" test. *Thornburgh* v. *Abbott*, 490 U.S. 401, 411–12, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989).

---

[21] Department officials may prohibit inmate mail from being sent only if it contains matter relating to the transport of contraband, escape plans, activity in violation of prison rules or specified regulations, criminal activity, if it is written in code or contains threats or other information that would create a clear and present danger of violence to a human being if communicated, or if it is an attempt to forward the unauthorized correspondence of another inmate. Regs., Conn. State Agencies § 18-81-31 (a). The regulation further provides that "[a]ny restrictions imposed on outgoing general correspondence shall be unrelated to the suppression of expression and may not be restricted solely based on unwelcome or unflattering opinions or factually inaccurate statements." Regs., Conn. State Agencies § 18-81-31 (c). If the correspondence is not mailed by the department for any of the reasons listed in § 18-81-31 (a), the inmate sending the correspondence must be notified in writing of the rejection of the correspondence and the reason therefor. The inmate may then seek review of the decision in writing within five days and the unit administrator must then notify the inmate of the final decision and the reasons therefor in writing. Regs., Conn. State Agencies § 18-81-31 (b).

The courts that have considered the constitutionality of the review of inmates' outgoing general correspondence by prison officials have overwhelmingly concluded that such a practice does not offend the federal constitution. *Beville* v. *Ednie*, 74 F.3d 210, 214 (10th Cir. 1996) ("[i]n order to enforce permissible restrictions which are reasonably related to substantial governmental interests, corrections officers must be able to inspect all outgoing mail"); *Witherow* v. *Paff*, 52 F.3d 264, 266 (9th Cir. 1995) ("cursory visual inspection" of outgoing mail addressed to Nevada attorney general constitutionally permissible); *Smith* v. *Delo*, 995 F.2d 827, 830 (8th Cir. 1993) (prison officials justified in screening outgoing nonlegal mail for escape plans, contraband, threats or evidence of illegal activity); *Stow* v. *Grimaldi*, 993 F.2d 1002, 1004–1005 (1st Cir. 1993) (prison policy requiring nonprivileged outgoing mail to be submitted for inspection in unsealed envelopes does not violate inmates' constitutional rights); *United States* v. *Whalen*, 940 F.2d 1027, 1035 (7th Cir.), cert. denied, 502 U.S. 951, 112 S. Ct. 403, 116 L. Ed. 2d 352 (1991) ("it is well established that prisons have sound reasons for reading the outgoing mail of their inmates"); *United States* v. *Kelton*, 791 F.2d 101, 103 (8th Cir.), cert. denied, 479 U.S. 989, 107 S. Ct. 583, 93 L. Ed. 2d 586 (1986) (fourth amendment not violated when prison official inspected and copied prisoner's outgoing mail); *Martin* v. *Tyson*, 845 F.2d 1451, 1457 (7th Cir. 1988) ("inspection of [pretrial detainee's] personal mail for contraband served a legitimate purpose and did not violate his first amendment rights").[22]

---

[22] The plaintiffs rely on *Wolfish* v. *Levi*, 573 F.2d 118, 130 (2d Cir. 1978), for their assertion that random review of their mail violates their constitutional rights. *Levi* is inapposite, however, because its holding was expressly limited to cases in which telephone calls and social visits are not also monitored. Under those circumstances, inmates are unlikely to use the mails for the furtherance of any illegal activity and the inspection of outgoing mail is unlikely to reveal any information useful to correctional officials. Therefore,

We are persuaded that the courts in these cases have correctly decided the constitutional issue before us. In *Martinez*, the court itself recognized that "the most obvious example of justifiable censorship of prisoner mail would be refusal to send . . . letters concerning escape plans or containing other information concerning proposed criminal activity." *Procunier* v. *Martinez*, supra, 416 U.S. 413. We agree with the reasoning of the First and Tenth Circuits that "there is no other way to determine whether escape plans or other proscribable matter is being sent except by looking at the correspondence." *Stow* v. *Grimaldi*, supra, 993 F.2d 1004; see *Beville* v. *Ednie*, supra, 74 F.3d 214 ("[i]n order to enforce permissible restrictions which are reasonably related to substantial governmental interests, corrections officers must be able to inspect all outgoing mail").[23] We conclude that § 18-81-31 is consistent with the constitutional standard set forth in *Martinez* because it is generally necessary to further the substantial governmental interests in security, order and rehabilitation.

## II

### The Defendant's Cross Appeal

We turn finally to the defendant's cross appeal. The trial court concluded that the department's conduct relating to attorney-inmate telephone calls was constitutionally deficient in three ways: (1) although § 18-81-46 of the Regulations of Connecticut State Agencies provides that, after placing a privileged call to an attorney and verifying the identity of its recipient, the staff member placing the call "shall then move out of the

under those circumstances, the court concluded that the review of outgoing mail could not be justified by concerns for institutional security. Id.

[23] We emphasize that there is no evidence in the record that any purely personal information contained in any inmate general correspondence was revealed to anyone other than the department employee whose function it was to review the contents of a given letter.

listening range of the inmate's conversation," those staff members regularly stay within listening range; (2) although § 18-81-46 provides that "[a]n inmate shall be provided a reasonable accommodation to make prearranged" attorney calls, the department's implementation of this regulation has been "haphazard," and some inmate requests for attorney calls have been denied altogether; and (3) the time allowed for attorney calls is generally limited to ten to twenty minutes.[24]

In their complaint, the plaintiffs claimed that the "[d]efendant's arbitrary limitations on the availability and length of confidential, unmonitored telephone calls between inmates and their attorneys, and monitoring of attorney calls violate [the] plaintiffs' right to counsel and right of access to courts, in violation of article first, §§ 8 and 10 of the Connecticut constitution." The trial court found as a factual matter that, on several occasions, staff members of the department had remained within earshot of inmate conversations with their attorneys. The trial court concluded that this practice was not only a violation of the department's regulations but also a violation of the fourteenth amendment to the federal constitution and article first, § 8, of the state constitution.

Accordingly, the trial court issued a declaratory judgment that the department must comply with the requirement of § 18-81-46 that staff members must not remain within listening range of attorney-inmate telephone calls. The defendant does not challenge this ruling.[25]

The defendant, however, does challenge the trial court's conclusion that the right to counsel and access

[24] Section 18-81-46 provides that attorney telephone calls "shall normally be limited to ten minutes duration." See footnote 4.

[25] We agree with the trial court that the plaintiffs have not established that the defendant is personally liable for monetary damages for this constitutional violation.

to courts provisions of article first, §§ 8 and 10,[26] of our state constitution embody a right to telephonic access to counsel that requires, at a constitutional minimum, that attorneys be allowed telephonic access to their inmate clients whenever the attorneys request it, and that inmates be allowed to initiate two thirty minute[27] telephone calls to attorneys per month, in addition to those calls requested by an attorney.[28] The defendant claims that the limitations on attorney-inmate telephone calls in the regulations do not violate the right to counsel or access to court provisions of either the state or the federal constitution. We agree.

An inmate's access to counsel implicates two distinct constitutional protections. First, it implicates the right to counsel guaranteed by the sixth amendment to the federal constitution and article first, § 8, of the state constitution. Second, and less directly, it implicates the inmate's right of access to courts guaranteed by the fourteenth amendment to the federal constitution and article first, § 10, of the state constitution. See *Procunier* v. *Martinez*, supra, 416 U.S. 419 (striking down rule restricting attorney-client interviews to members of bar and licensed private investigators as violative of inmates' right of access to courts). We address these claims seriatim.

---

[26] Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have right to be heard by himself and by counsel . . . ."

Article first, § 10, of the Connecticut constitution provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[27] The trial court order also would require the department to extend the length of an attorney telephone call "at the specific oral or written request of the attorney."

[28] The court's order also requires that a request by an attorney to speak over the telephone with a client, or vice-versa, shall be honored, in the absence of exigent circumstances, "either by the close of the first business day following the day on which correctional authorities receive the request or at the time specified by the [inmate or attorney,] whichever shall later occur."

It is axiomatic that all criminal defendants, including inmates, have a right to counsel throughout the pendency of criminal proceedings against them in the trial court; *Gideon* v. *Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); *Argersinger* v. *Hamlin*, 407 U.S. 25, 92 S. Ct. 2006, 32 L. Ed. 2d 530 (1972); and during the pendency of appeals as of right. *Douglas* v. *California*, 372 U.S. 353, 83 S. Ct. 814, 9 L. Ed. 2d 811 (1963). It is also settled beyond question that, under both the federal and the state constitutions, this right to the assistance of counsel includes the right to communicate effectively with counsel in the preparation of one's defense. *State* v. *Mebane*, 204 Conn. 585, 603, 529 A.2d 680 (1987), cert. denied, 484 U.S. 1046, 108 S. Ct. 704, 98 L. Ed. 2d 870 (1988) (consultation with attorney during recesses); *State* v. *Ferrell*, 191 Conn. 37, 42 n.5, 463 A.2d 573 (1983) ("consultation is obviously necessary to enable the attorney to gain information so that he can properly advise his client"); *Flaherty* v. *Warden*, 155 Conn. 36, 39, 229 A.2d 362 (1967) (same). " '[T]he denial of opportunity for appointed counsel to confer, to consult with the accused and to prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel.' *Avery* v. *Alabama*, 308 U.S. 444, 446, 60 S. Ct. 321, 84 L. Ed. 377 [1940]; *Chambers* v. *Maroney*, 399 U.S. 42, 59, 90 S. Ct. 1975, 26 L. Ed. 2d 419 [1970]." *State* v. *Greene*, 161 Conn. 291, 287 A.2d 386 (1971). The trial court concluded that, in the prison setting, this constitutional right to confer with counsel includes the right to confer telephonically as frequently as counsel desires and includes, in addition, two thirty minute telephone calls per month at the request of the inmate. We conclude that neither the federal nor the state constitution contains any such particularized right to confer with counsel.

The right to the effective assistance of counsel is grounded in the mandates of the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. Under both the federal constitution and the state constitution, however, the right to counsel is the right to counsel's effective assistance, and not the right to perfect representation or unlimited access to counsel. See *Commissioner of Correction* v. *Rodriquez*, 222 Conn. 469, 478, 610 A.2d 631 (1992); *State* v. *Barber*, 173 Conn. 153, 159–60, 376 A.2d 1108 (1977). Department regulations require that inmates "shall be provided a reasonable accommodation to make prearranged non-recorded telephone calls to [attorneys] on non-collect call only telephones" and that "[s]uch calls shall normally be limited to ten minutes duration." Regs., Conn. State Agencies § 18-81-46. The trial court found that, in reality, the typical length of attorney calls was between ten and twenty minutes, and that there had been some instances in which requests for attorney calls had been denied. The trial court also found, however, that there was no evidence in the record that any inmate had been denied the effective assistance of counsel as a result of the limitations on the inmates' ability to confer with counsel over the telephone.

The fact that the record contains no evidence that any of the plaintiffs has been denied the effective assistance of counsel as a result of the telephone regulations is not surprising, given the variety of opportunities that inmates in our state have to communicate with counsel. They are allowed unlimited communication through the mails. Regs., Conn. State Agencies § 18-81-35. They are allowed an unlimited number of personal visits by attorneys, investigators, paralegals and law students. An attorney and his or her incarcerated client can confer in the lockup at the courthouse each time the inmate has a scheduled court date. Furthermore, the attorney

and client can generally communicate over the telephone, subject to the limitations set forth in the regulations. These numerous and varied means of communication provide adequate opportunity for inmate and attorney to confer meaningfully, as required by both the federal and the state constitutions. See *State* v. *Ferrell*, supra, 191 Conn. 42 n.5; *Flaherty* v. *Warden*, supra, 155 Conn. 39. If, for any reason and at any stage of the proceedings, attorney and client have not had the ability to communicate sufficiently, the defendant can bring that fact to the court's attention and we would expect the court to ensure that the defendant and counsel are afforded a reasonable opportunity to confer as required by both the state and the federal constitutions. See *State* v. *Deleon*, 230 Conn. 351, 645 A.2d 518 (1994) (defendant moved in trial court for continuance based on insufficient communication with counsel based in part on allegedly restrictive visitation policy at Hartford correctional facility); *Bailey* v. *State*, 521 A.2d 1069, 1084–85 (Del. 1987) (approving trial court's issuance of detailed order in response to inmate's claim that prison officials had interfered with right to confer with counsel).

In the absence of evidence that any inmate has been denied a reasonable opportunity to confer with counsel or has been denied the effective assistance of counsel, we cannot conclude that the department's practices violate the right to counsel to which inmates are entitled, in certain legal proceedings, under both the state and the federal constitutions. We are, therefore, unwilling to invade the province of the department and order specific modifications of department regulations or otherwise micromanage attorney-client contact in a prison setting. "Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human

nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism." *Procunier* v. *Martinez*, supra, 416 U.S. 404–405.

We next consider the plaintiffs' access to courts claim under the fourteenth amendment to the federal constitution and article first, § 10, of the state constitution. The trial court concluded that, although the department's practices pertaining to attorney telephone calls do not violate the federal access to courts guarantee, those practices do violate the independent guarantee of that right under our state constitution. The plaintiffs urge that we conclude that department practices violate the access to courts protections of both the federal and the state constitutions. The defendant, on the other hand, argues that the limitations imposed on attorney-inmate telephone conversations do not violate the access to courts provision of either constitution. We agree with the defendant.[29]

---

[29] We note that the United States Supreme Court recently concluded that an inmate or class of inmates must establish an injury in fact resulting from a lack of access to legal materials or other legal guidance to prevail on an access to courts claim under the federal constitution. *Lewis* v. *Casey*, U.S. , 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996). "[T]he inmate . . . must . . . demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the

"It is now established beyond doubt that prisoners have a constitutional right of access to the courts . . . [and that such access must be] adequate, effective and meaningful." (Citations omitted; internal quotation marks omitted.) *Bounds* v. *Smith*, 430 U.S. 817, 821–22, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977). Decisions of the United States Supreme Court "have consistently required [s]tates to shoulder affirmative obligations to assure all prisoners meaningful access to the courts. It is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them. States must forgo collection of docket fees otherwise payable to the treasury and expend funds for transcripts. State expenditures are necessary to pay lawyers for indigent [criminal] defendants at trial, *Gideon* v. *Wainwright*, [supra, 372 U.S. 335]; *Argersinger* v. *Hamlin*, [supra, 407 U.S. 25], and in appeals as of right, *Douglas* v. *California*, [supra, 372 U.S. 353]." *Bounds* v. *Smith*, supra, 824–25. "*Bounds* does not [however] guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collater-

---

prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint." Id., 2180. Although we could dispose of at least the plaintiffs' *federal* access to courts claim under *Lewis* based on the failure of the plaintiffs to establish that any inmate had been injured in fact, we need not do so and we decline to do so in the interest of avoiding unfair surprise to the plaintiffs because the case was neither litigated in the trial court nor briefed and argued in this court with the *Lewis* decision in mind. We also do not decide if the *Lewis* "injury-in-fact" requirement applies to state constitutional claims as well. Rather, we will decide the issue presented to us by the plaintiffs, namely, whether the department regulations, on their face, violate the plaintiffs' right of access to the courts.

ally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Lewis* v. *Casey*, U.S. , 116 S. Ct. 2174, 2182, 135 L. Ed. 2d 606 (1996).

"[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers . . . ." *Bounds* v. *Smith*, supra, 430 U.S. 828. Such assistance, however, may take many forms. *Lewis* v. *Casey*, supra, 116 S. Ct. 2182 ("*Bounds* . . . guarantees no particular methodology but rather the conferral of a capability—the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts"); *Murray* v. *Giarratano*, 492 U.S. 1, 14, 109 S. Ct. 2765, 106 L. Ed. 2d 1 (1989) (Kennedy, J., concurring) (right of meaningful access to courts "can be satisfied in various ways"); *Bounds* v. *Smith*, supra, 831 ("[a]mong the alternatives are the training of inmates as paralegal assistants to work under lawyers' supervision, the use of paraprofessionals and law students, either as volunteers or in formal clinical programs, the organization of volunteer attorneys through bar associations or other groups, the hiring of lawyers on a part-time consultant basis, and the use of full-time staff attorneys, working either in new prison legal assistance organizations or as part of public defender or legal services offices").

We conclude that reasonable restrictions on inmate telephone calls to attorneys are constitutional, so long as other viable means are available to the inmates to pursue their legal claims. *Robbins* v. *South*, 595 F. Sup. 785, 789–90 (D. Mont. 1984) (policy requiring inmates to obtain prior written authorization to telephone their attorney and limiting those calls to one per week found reasonable in light of inmates' ability to correspond

with attorneys through mail and during prison visits); *Pino* v. *Dalsheim*, 558 F. Sup. 673, 675 (S.D.N.Y. 1983) (unlimited personal and mail communication with attorney constitutionally sufficient because state is not required to provide best manner of access); see also *Walters* v. *Thompson*, 615 F. Sup. 330, 340 (N.D. Ill. 1985) (lack of telephonic access to counsel may not deprive inmates of access to courts if inmates have access to law library).

Providing telephonic access to counsel is clearly one appropriate way to guarantee an inmate an opportunity to have his or her legal claims, both civil and criminal, properly framed and brought before a court of competent jurisdiction. As stated in *Bounds*, however, this is only one of several ways of assuring inmates the opportunity to present their legal claims to our courts. *Bounds* v. *Smith*, supra, 430 U.S. 831. Reasonable access to a law library within the correctional facilities; *Walters* v. *Thompson*, supra, 615 F. Sup. 340; consultation with attorneys or their representatives through the mails and personal visits; *Pino* v. *Dalsheim*, supra, 558 F. Sup. 675; and consultation with attorneys over the telephone within department guidelines; *Robbins* v. *South*, supra, 595 F. Sup. 789–90; are all valid methods of ensuring that inmates are not denied the access to the courts to which they are entitled by the fourteenth amendment and article first, § 10.

The plaintiffs argue that, even if their federal constitutional right of access to courts does not require that inmates be given a specific right to telephone attorneys with a specified level of frequency, article first, § 10, does encompass such a right. In making this argument, the plaintiffs rely primarily on the sixth *Geisler*[30] factor—"contemporary understandings of applicable economic and sociological norms." *State* v. *Ross*, supra,

---

[30] See *State* v. *Geisler*, supra, 222 Conn. 685.

230 Conn. 249. The plaintiffs argue that the practical difficulty of arranging personal interviews in the prison setting and the inability of illiterate inmates to communicate through the mails require, under the state constitution, that inmates be allowed to confer with counsel over the telephone. As we noted with respect to the right to counsel, however, there is adequate opportunity for Connecticut inmates to obtain legal assistance under the existing department regulations. We conclude that, under the circumstances of this case, article first, § 10, requires, as does the federal constitution, only that inmates be afforded meaningful access to the courts and that the means of providing such access can take many forms. See *Bounds* v. *Smith*, supra, 430 U.S. 831. Merely because inmates are not entitled to telephone an attorney whenever the urge strikes them does not mean that they have been denied meaningful access to courts under the state constitution. If, for any reason, a particular inmate is deprived of the right of meaningful access to the courts, we will address those claims on a case-by-case basis. See *Lewis* v. *Casey*, supra, 116 S. Ct. 2180 (successful federal access to court claims require showing of particularized harm); *Walters* v. *Thompson*, supra, 615 F. Sup. 340 ("analysis of a meaningful access-to-court claim must proceed on a case-by-case basis and be rooted in the particular facts of each case"). Today, we hold only that the department regulations and practices pertaining to attorney-inmate telephone calls do not, on their face and as a matter of law, deprive inmates of meaningful access to the courts.

The judgment of the trial court with regard to the plaintiffs' personal telephone calls from collect call only telephones and with regard to the review of the plaintiffs' outgoing mail is affirmed, the judgment of the trial court with respect to attorney-client telephone calls is reversed except for that portion of the judgment declaring that inmates are entitled to privacy when mak-

ing such calls, and the case is remanded to the trial court with direction to render judgment in accordance with this opinion.

In this opinion BORDEN, NORCOTT and PALMER, Js., concurred.

BERDON, J., dissenting. The court today unreasonably burdens the plaintiff inmates' (both preconviction and postconviction) right of access to their attorneys. In doing so, this court not only deprives the plaintiffs of their state constitutional rights, but also makes it more difficult for public defenders and legal assistance attorneys to effectively serve their clients. Presently, legal assistance for the poor is scarce. Resources are being stretched to their limits, as those who serve the poor are increasingly burdened with heavy caseloads. The court's insensitivity to the plight of the poor is disturbing, as its decision today places yet another obstacle in the path of providing justice to the poor.

Although I disagree with much of what the majority holds today, I will address only the issue of the state constitutional right of access between an inmate and his or her lawyer raised in the defendant's cross appeal.[1] The majority concedes, as it must, that the plaintiffs have not only a state constitutional right of access to the courts; Conn. Const., art. I, § 10; but also a right of access to counsel. Conn. Const., art. I, § 8. The majority, however, examines the constitutionality of the plain-

[1] Although I focus, as the majority does, on the state constitutional rights of the plaintiffs, they also have a federal constitutional right of access to their attorney: "The constitutional guarantee of due process of law has as a corollary the requirement that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights. This means that inmates must have a reasonable opportunity to seek and receive the assistance of attorneys. Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier* v. *Martinez*, 416 U.S. 396, 421, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974).

tiffs' claims in terms of whether they have been deprived of their right to "effective assistance of counsel." Although these rights are related, interference with the constitutional right of access to counsel is not measured in terms of whether an individual has been denied effective assistance of counsel.[2]

This court has held that interference with an attorney's reasonable access to his or her client, who is in the custody of the state, violates the state constitutional right of access to counsel. *State* v. *Stoddard*, 206 Conn. 157, 167, 537 A.2d 446 (1988) (When counsel seeks to contact his or her client who is in custody, the client must be notified. "The police, because they are responsible for the suspect's isolation, have a duty to act reasonably, diligently and promptly to provide counsel with accurate information and to apprise the suspect of the efforts by counsel."). The provision of mere access between a client and his or her lawyer does not satisfy the state constitution; rather, the access provided must be *reasonable*. *State* v. *Ferrell*, 191 Conn. 37, 43–45, 463 A.2d 573 (1983) (admissions made by defendant while conversing with counsel on telephone and overheard by police were not admissible). Read together, *Stoddard* and *Ferrell* stand for the proposition that the state constitutional right of access to counsel, as informed by the due process clause, requires that inmates must have reasonable access to counsel at a meaningful time and in a meaningful manner.

In this age, access to counsel, which is meaningful in its time and manner, includes telephonic communica-

[2] Recently, this court noted: "In *Strickland* v. *Washington*, [466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984)], the United States Supreme Court adopted a two-part standard for evaluating claims of ineffective assistance of counsel during criminal proceedings: the defendant must show: (1) that counsel's representation fell below an objective standard of reasonableness; id., 687–88; and (2) that defense counsel's deficient performance prejudiced the defense. Id., 694." *Copas* v. *Commissioner of Correction*, 234 Conn. 139, 154, 662 A.2d 718 (1995).

tion. The realization of the right of access to counsel cannot depend upon postal correspondence, for contemporaneous dialogue is often vital to the attorney-client relationship. Development of a proper defense requires open and uninhibited communication between the client and the attorney. Matters that may seem unimportant to the client, could ultimately prove to be crucial to his or her defense. The majority's focus on postal correspondence as a means of communication between an attorney and his or her client also ignores the situation of those inmates who are illiterate and poorly educated. Furthermore, the physical location of counsel often renders the telephone the most effective means of communicating. As the trial court noted, the state's prisons are often a significant distance from the attorney's office or the court.[3] Restricting telephonic communication will discourage attorneys from representing inmates, further drain the resources of the public defender's office, and hinder the establishment of an appropriate relationship between an incarcerated client and his or her attorney.

In sum, the state constitutional right of access to counsel, in my view, is violated when the state refuses to allow reasonable telephonic communication between an attorney and his or her incarcerated client. That access, to meet constitutional standards, must be provided at a meaningful time and in a meaningful manner.

---

[3] The trial court stated in its memorandum of decision: "The realities facing Connecticut's lawyers must also be considered. Lawyers who represent incarcerated clients, like the incarcerated clients themselves, have no control over the location in which those clients are confined. Clients may be confined at a substantial distance from either their lawyers' offices or the courts in which those lawyers are obliged to appear. Lawyers are busy people. An attorney in Stamford who represents a client incarcerated in Somers will rarely have the luxury to take a day from his busy schedule and visit his client in person. If he is required to do so, other clients (and the courts) will be deprived of his services for that day. If a trial or other hearing is imminent, the mail may be too slow. In order to practice law efficiently and responsibly in the modern world, a Connecticut lawyer needs to have telephonic access to his clients."

Section 18-81-46 of the Regulations of Connecticut State Agencies, concerning telephonic access between inmates and their attorneys, provides in relevant part: "An inmate shall be provided a reasonable accommodation to make prearranged non-recorded telephone calls to [his or her attorney] on non-collect call only telephones without the recording and/or listening provided for in Section 18-81-44 above, and provided the [attorney] called agrees to accept the charges. Such calls shall be placed by staff who shall verify the party's identity prior to placing the inmate on the line. The staff member shall then move out of listening range of the inmate's conversation. The employee placing the call may maintain visual observation of the inmate. Such calls shall normally be limited to ten minutes duration."

I agree with the trial court that § 18-81-46, by its terms and application, violates the state constitutional guarantee of access to counsel in three respects.[4] First, the specific time limitation of ten minutes for telephonic contact with an attorney places an unreasonable limitation upon the inmates' access to counsel. The trial court found that "this requirement is interpreted and enforced virtually at the whim of the staff member in charge of the telephone. The actual time limit enforced seems to be between ten and twenty minutes, but that limit cannot be predicted with respect to any particular call. The substance of the call or the inmate's or the attorney's need for a longer conversation does not seem to be a factor. (Of course, at least in theory, the staff member is not supposed to be listening to the conversation in the first place.) Rather, the decisive factor in determining whether a privileged conversation is to be stopped—assuming that the decision is not wholly capricious—is the need of the staff member or another inmate to use the telephone. In any event, it is clear that many

---

[4] The defendant does not challenge the trial court's order with respect to its prohibition of correction officials from standing within listening range of an inmate's privileged telephone conversation. See footnote 7 of this dissent.

privileged conversations are simply stopped without consulting either [the] inmate or [the] attorney as to the need for a longer conversation." The trial court concluded, and I agree, that although, as a practical matter, certain limitations must be established, each inmate should be allowed to make two privileged telephone calls a month to his attorney.[5] In the absence of exigent circumstances, such calls may be limited to a thirty minute duration, subject to an extension at the specific oral or written request of the attorney.

Second, the staff of the various correctional facilities frequently failed to comply with the mandate of § 18-81-46 that the staff member placing the telephone call "shall then move out of listening range of the inmate's conversation." The trial court found that "[t]here is overwhelming evidence that this requirement is often simply ignored." As noted by the trial court, "[t]his is not only a violation of § 18-81-46 but is incompatible with the requirements of the state and federal constitutions."[6]

Third, despite the directive of § 18-81-46 that "[a]n inmate shall be provided a reasonable accommodation to make prearranged non-recorded telephone calls," the trial court found that "[t]here does not appear to be any uniform interpretation of the word 'prearranged.'" More importantly, the trial court found that "[a] number of inmates credibly testified that requests for privileged phone calls duly accompanied by attorney letters had either been ignored altogether or had been granted at

[5] More specifically, the trial court ordered that "[t]his total does not include calls answered by busy signals but does include calls answered by a person or machine capable of taking a message."

The trial court also held that, because "public defenders are employed by the state to represent indigent clients and are not permitted to accept collect calls," and because the agency "Legal Assistance to Prisoners is similarly funded by the state . . . and is also unable to accept collect calls," the department of correction must allow inmates to place toll free calls to those agencies, if they are so represented. See footnote 7 of this dissent.

[6] The defendant does not challenge the trial court's remedial order with respect to this violation.

some time after the time specified in the attorney letter had already passed." I agree with the trial court's remedial order set forth in footnote 7 of this dissent.

Therefore, with respect to telephone access between an inmate and his or her attorney, I would affirm the order of the trial court.[7]

Accordingly, I dissent.

---

[7] The trial court's order provides in relevant part: "It is ordered that the Commissioner of Correction, his officers, and employees shall:

"(1) In the absence of exigent circumstances, comply with the provision of [§ 18-81-46 of the Regulations of Connecticut State Agencies] that, after the staff member placing a privileged call has verified the identity of the person called and placed the inmate on line, '[t]he staff member shall then move out of listening range of the inmate's conversation.' A staff member shall approach within listening range only if exigent circumstances require the privileged call to be interrupted or in order to terminate a call at the expiration of the time limitations described below.

"(2) In the absence of exigent circumstances, honor requests by attorneys (including paralegals and law students working under an attorney's supervision) for privileged calls to inmates either by the close of the first business day following the day on which correctional authorities receive the request or at the time specified by the attorney, whichever shall later occur. Such requests shall be honored without limitation as to number or frequency.

"(3) In the absence of exigent circumstances, allow each inmate to make two privileged calls a month in addition to calls initiated by that inmate's attorney. This total does not include calls answered by busy signals but does include calls answered by a person or machine capable of taking a message. In the absence of exigent circumstances, an inmate['s] request for a privileged call shall be honored either by the close of the first business day following the day on which correctional authorities receive the request or at the time specified by the inmate, which ever shall later occur.

"(4) Allow privileged calls placed to state and federal public defender offices and Legal Assistance to Prisoners to be made toll free. This order does not extend to private attorneys handling particular cases as special public defenders or on a pro bono basis.

"(5) Cease and desist from enforcing the provision of [§ 18-81-46 of the Regulations of Connecticut State Agencies] that privileged telephone calls 'shall normally be limited to ten minutes duration.' In the absence of exigent circumstances, privileged telephone calls may be limited to thirty minutes duration. In the absence of exigent circumstances, this limitation shall be increased at the specified oral or written request of the attorney.

"(6) Nothing in this order prohibits the Commissioner, his officers, and employees from establishing reasonable hours within which privileged telephone calls can be made. . . ."