[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Department of Labor, Wethersfield, CT Hearing Date: January 26, 1998 Award Date: April 3, 1998
John A. Nord, Jr., Principal Labor Relations Specialist, for the State.
Donald Sevas, Staff Representative, for the Union.
 ISSUE
The parties stipulated and agreed to the following issue to be decided by this arbitrator: Was the dismissal of the grievant, Gregory Frederick, for 3 just cause? If not, what shall be the remedy consistent with the contract?
 BACKGROUND
The grievant, Gregory Frederick, at the time of his termination on June 18, 1997 had been an employee with the Department of Corrections for a little more than seven (7) years. This individual is married and he and his wife have two children. During his employment with the State, the grievant has received yearly service evaluations, all of which have been extremely CT Page 2489 positive placing him in the enviable position of being an employee any employer would be happy to have working for them. In addition to positive service evaluations, the grievant has also received numerous commendations during his tour of employment. The commendations received by the grievant exemplified the fact that he was willing to receive additional training as well as to train others so that both he and the other fellow employees would be better employees and better able to do their duties for the State. As a correction guard, the grievant has been chosen to be a member of the department's following squads: 1) Correctional Emergency Response Team; 2) Cell Extraction Team; 3) First Aid Instructor; 4) CPR Instructor; 5) Special Olympics Coordinator; 6) In-service Training Instructor; 7) Chronic Disciplinary Housing Units; 8) Mental Health Housing Unit; 9) Gang Management/High Security Housing Unit.
In May 1997, the grievant attended a Union rally held at the State Capitol Building in Hartford. The Union had called the rally after the State Senate had rejected an interest arbitration award which affected the labor contract covering the grievant and other correction employees. The grievant and other attendees of the rally were urged by the Union leadership to contact the members of the Senate in order to voice their individual displeasure with the actions taken by the members of the Senate in rejecting the arbitration award. In order to assist the grievant and other attendees in this phone campaign, the names and phone numbers of the individual legislators were listed and the lists were given to those attending the rally. The grievant called approximately six (6) legislators. One legislator whom the grievant called, the grievant had been informed had referred to correction officers in general as "criminals". The grievant, not being able to reach the legislator who allegedly referred to corrections officers as criminals, left a message on said legislator s answering machine which message used vulgarities including the "f" word and a racially derogatory term using the "n" word. It is pointed out that the legislator for whom the message was left is an African-American. The call was made by the grievant from a state institution while he was on duty. The legislator reported the call to legislative security and, as a result of the report, the matter was investigated. When the investigators ultimately contacted the grievant in reference to the call, he at first denied making it but when returning to work the following day, he called the investigator and admitted that he did, in fact, make the call. Based on the call message left on the legislator's voice mail by the grievant, his employment with CT Page 2490 the corrections department was terminated: said termination being effected June 18, 1997. As a result of the telephone message, the grievant was also arrested and his matter was handled by the Superior Court in Hartford by the Court admitting the grievant to an accelerated rehabilitation program. The charge for which the grievant was arrested was a second-degree harassment charge that will be dismissed if the grievant properly completes the accelerated rehabilitation program. It is noted that one of the conditions for the proper completion of the accelerated rehabilitation program was the Judge's order that the grievant send to the legislator a handwritten letter of apology indicating the basis for the apology. The grievant had already of his own volition sent such a letter to the legislator by written mail on May 29, 1997 but the letter has been returned to the grievant as not being accepted by the sendee after delivery was attempted on May 29, 1997 and June 4, 1997.
 UNION'S POSITION
The Union's position is that the grievant used poor judgment in the language he used in the message left for the legislator in May of 1997. Although agreeing that the grievant was in error in his actions, the Union maintains that the actions required discipline be imposed on the grievant but they were not severe enough that the grievant's employment should be terminated.
 STATE'S POSITION
The State's position is that the words of the message were racially charged manifesting hate. Further, the State maintains that the vileness and repugnant nature of the words heard on the tape are reprehensible to society and humanity. Based on the hateful and racially charged and socially reprehensible words comprising the message left the legislators by the grievant, the grievant must be terminated.
 FINDINGS
This arbitrator, based on the admission of the grievant, finds that he did, in fact, leave the stipulated to message for the legislator. This act was wrong. Although society seems to accept vulgarity as common everyday language; same being heard on television, same being read in magazines; same being read in books; and same being read on bumper stickers, it is still not proper language to be used. It is obvious that the "f" word and CT Page 2491 the other obscene words used by the grievant are probably often heard in the institutions in which the grievant was employed. In fact, the n word is probably used and heard many times a day in said institution but, in the opinion of this arbitrator, their use of any of those words in those institutions do not make their use proper. The odd portion of this case is that the grievant, based on his service evaluations, his commendations, his being chosen to work in certain units and his lack of prior discipline seems to have acted in May of 1997 completely contrary to his normal behavior. Why would he have done such a thing?
In reviewing the evidence, this arbitrator notes that the grievant's wife, who was pregnant at the time, developed complications with her pregnancy. It is also noted that the grievant had just become aware that his eldest daughter had developed juvenile diabetes. Further, the grievant's financial and personal responsibilities had increased tremendously. In addition to all of this, the grievant, who had not been awarded an increase in wages for over four (4) years, had just been informed that the arbitration award which would have given him an increase in salary had been turned down by the State Senate and one of the legislators comprising the State Senate was, in fact, calling correction guards "criminals" because of the objections they had voiced to the action of the State Senate. Were those thoughts the reasons the grievant used the words he did in the phone message he left for the legislator? Based on all the other evidence, it does not seem that the grievant normally used the terms that comprised the message he left for the legislator or, if so, he at least was never known to have done so because he was never disciplined for doing so. The grievant's employment history is void of any prior discipline. It is noted in the contract between the parties in Article 13 that there are many ways in which to discipline an employee including reprimands, suspensions, demotions, discharge and transfer between facilities. It is also noted that in Section 3 of Article 13, the contract requires that no employee shall be disciplined or discharged except for just cause. Although this arbitrator finds that there is no question that there was just cause in this matter for discipline, there is serious question as to whether or not termination was the proper form of discipline to be meted out to this grievant for the act he admittedly performed. As herein before pointed out in these findings, the contract between the parties provides for many forms of discipline. The numerous forms of discipline provided indicate to this arbitrator that some type of progressive discipline had to be in mind when setting up the CT Page 2492 contents of Article 13.
Based on this, when one reviews the lack of prior discipline given to this grievant during his term of employment with the State, the acknowledged stress-filled conditions under which the employee works as correction officers as shown by Article 44 of the labor contract between the parties and the service evaluations received by the grievant which have only positive notes in any area which would be related to stress conditions of any type, this arbitrator must assume that no actions of any type or nature were performed by this grievant which indicated a fault or condition such as demonstrated by the message left by the grievant for the offended legislator. While the mental thoughts of family problems, financial problems and employment contractual problems are not sufficient to justify the issuance of the words contained in the grievant's message to the legislator, they must be considered in establishing a proper degree of discipline for the action itself Are all violations of the contract to be penalized with one's termination of employment or are some to call for reprimands, suspension or less? Progressive discipline, as all discipline, is to punish an employee for his wrongdoing but also is an attempt to prevent the grievant from performing these same acts again. There are certain acts, of course, which require immediate and instant termination. In the opinion of this arbitrator, the message left by this grievant is not of that nature. This arbitrator notes that in Article 44 of the contract between the parties that stress management is recognized as a concern that both parties must work to overcome. The grievant's performance appraisals all state in part that he works well with others and does whatever [sic] to get the job done, that he has good relationships with fellow staff and supervisors, that he works well with and is willing to train others and that his judgment is usually sound and logical, uses proper judgment in dealing with inmate population and uses logical judgment when making decisions. If, in fact, the grievant had any past stress problems with the department, they do not seem to be indicated by these comments.
The State, in its brief on this matter, has referred to the message as containing hate-filled words. Although finding the message to be rampant with vulgarities and containing a racial slur, this arbitrator does not find that the message was full of hate-filled words. While it is true that the language is not such that it should, in this arbitrator's opinion, be used in proper society, it still is language which is used in some societies and CT Page 2493 is not used at all times in any society as hate-filled words. In this arbitrator s opinion, the words used by the grievant seem to have been born from anger and were being used by the grievant to degrade, harass or annoy the legislator but not to alarm him such as to put him in fear of the grievant.
There was no evidence introduced at the hearing as to why the legislator referred to the corrections officers as "criminals". Whether his reference was based on certain actions is not at all clear to this arbitrator. It is, however, found that even if the word "criminal" was used totally without justification this would not justify the reaction demonstrated by the grievant in the message he left to the legislator.
The State, in its brief, points out that the grievant is serving a court-sanctioned two-year probationary period and performing 300 hours of community service after receiving accelerated rehabilitation for the Class C misdemeanor of second-degree harassment placed against the grievant for the message he left against the legislator. It is noted that the grievant was not terminated because he was on probation, because he was performing 300 hours of community service or because he received accelerated rehabilitation for the Class C misdemeanor of second-degree harassment but rather was terminated because of the statement he made and only the statement that he made.
The actions of the grievant were acknowledged by him to be wrong as demonstrated by the letter of apology that he sent to the legislator. Why this letter was not accepted by the legislator is for anyone to guess. Acknowledgement of his wrongdoing by the grievant indicates to this arbitrator that he is the type of individual who once admitting his wrong expects and is willing to accept reasonable punishment for same. The grievant's actions in the Superior Court indicate the same type of individual. Although the criminal process itself was not the basis of the termination in this matter, it must be noted that the grievant was severely chastised and punished by the Court, most likely because of the position held by the grievant in his employment and the position of the legislator to whom the grievant addressed his comments.
It is found by this arbitrator that the message left by the grievant is repugnant, is the type not to be used by anyone at any time and certainly not by a correction officer while making a phone call from a state institution to a legislator sitting in CT Page 2494 the State Senate. It is found that although the statement made was based on certain stress affecting the grievant at that time, the statement is not justified but said stress does require a mitigation of the discipline levied against this grievant. Further, it is found that the grievant's employment history is such that his termination of employment under the found facts of this case is not justified and that said discipline must be reduced.
 AWARD
The termination of the grievant effective June 18, 1997 is vacated and same is reduced to a suspension of sixty (60) working days without pay. The State is ordered to reinstate the grievant forthwith with all benefits and pay lost by the grievant from June 18, 1997 to the date of his reinstatement less the pay covering the sixty (60) working days suspension. Further, the back pay award is to be further decreased by any form of compensation received by the grievant during the time of June 18, 1997 to the date of his reinstatement except for the first sixty (60) working days commencing with what would have been the grievant's first working day after June 18, 1997. The back pay award should be paid at the rate the grievant would have earned during the applicable time period.
The State shall place a copy of this arbitration award in the grievant's personnel file. Employment record should include a of this award.
CONNECTICUT STATE BOARD OF MEDIATION AND ARBITRATION
By________________________ Thomas J. Staley, Esq.
Following the issuance of the award, the state filed its May 4, 1998, Application to Vacate the arbitrator's award. The state argues that the award violates Connecticut General Statutes Section 52-418 and the common law, that enforcement of the award would violate an explicit, well-defined and dominant public policy, and that there is "just cause" for dismissal.[2] In its September 30, 1998, Memorandum in Support at page 5, the state argues that the reinstatement violates the public policy of the state against "hate crimes." In oral argument on January 4, 1999, the state also put forth the argument that the state policy being CT Page 2495 violated was embodied in Section 53a-183(a).[3]
The defendant argues, among other things, that this court may not disturb the arbitrator s conclusion that the message was not full of hate-filled words: that no explicit, well-defined and dominant public policy against hate-crimes has been violated by Mr. Frederick; and that the regulations cited by the state in support of its argument are not an appropriate source of a purported public policy. Defendant also asserts that Section 53a-183(a) does not provide a substantial or definite enough basis to support a finding that an important public policy is implicated.
Controlling Legal Principles
Before explaining the reasoning behind this decision, a brief review of controlling legal principles would be of assistance. Then Justice, now Chief Justice Callahan's summary of the relevant caselaw is found in Watertown Police Union Local 541 v.Watertown, 210 Conn. 333 (1989), as follows:
We have consistently stated that arbitration is the favored means of settling differences and arbitration awards are generally upheld unless an award clearly falls within the proscriptions of 52-418 of the General Statutes." Board of Education v. AFSCME, 195 Conn. 266, 270, 487 A.2d 553 (1985); Board of Education v. Bridgeport Education Assn., 173 Conn. 287, 290, 377 A.2d 323 (1977); International Union v. Fafnir Bearing Co., 151 Conn. 650, 653, 201 A.2d 656 (1964); Board of Education v. Local 818, 5 Conn. App. 636, 639, 502 A.2d 426 (1985). A challenge of the arbitrator's authority is limited to a comparison of the award to the submission. Bic Pen Corporation v. Local No. 134, 183 Conn. 579, 584, 440 A.2d 774 (1981); see also American Universal Ins. Co. v. DelGreco, 205 Conn. 178, 186, 530 A.2d 171 (1987); Board of Education v. AFSCME, Supra, 271; Caldor, Inc. v. Thornton, 191 Conn. 336, 340, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985); Bruno v. Department of Consumer Protection, 190 Conn. 14. 18, 458 A.2d 685 (1983); Bridgeport v. Bridgeport Police Local 1159, 183 Conn. 102, 106, 438 A.2d 1171 (1981); Board of Education v. Local 818, supra. An award, therefore, will normally be vacated only if it fails to conform to the submission, and the party challenging it has the burden of producing evidence sufficient to show that it does not conform to the submission. Bic Pen Corporation v. Local No. 134, supra, 585. Where the CT Page 2496 submission does not otherwise state, the arbitrators are empowered to decide factual and legal questions and an award cannot be vacated on the grounds that the construction placed upon the facts or the interpretation of the agreement by the arbitrators was erroneous. Courts will not review the evidence nor, where the submission is unrestricted, will they review the arbitrators' decision of the legal questions involved. Meyers v. Lakeridge Development Co., 173 Conn. 133, 135, 376 A.2d 1105 [1977].'" Id., 584, quoting Waterbury v. Waterbury Police Union, 176 Conn. 401, 404, 407 A.2d 1013
(1979); Caldor, Inc. v. Thornton, supra, 340-41.
In spite of the general rule that challenges to an arbitrator's authority are limited to a comparison of the award to the submission. an additional challenge exists under 52-418(a)(4) when the award rendered is claimed to be in contravention of public policy. New Haven v. AFSCME, Council 15, Local 530, 208 Conn. 411, 416-17, 544 A.2d 186 (1988); Stratford v. Local 134, IFPTE, 201 Conn. 577, 590-91, 519 A.2d 1 (1986); Board of Trustees v. Federation of Technical College Teachers, 179 Conn. 184, 195, 425 A.2d 1247 (1979); Stamford v. Stamford Police Assn., 14 Conn. App. 257, 259, 540 A.2d 400 (1988); State v. Connecticut Council 4, CEU, AFSCME, 7 Conn. App. 286, 290, 508 A.2d 806 (1986); International Brotherhood of Police Officers v. Windsor, 40 Conn. Sup. 145, 483 A.2d 626 (1984); Avco Corporation v. Preteska, 22 Conn. Sup. 475, 174 A.2d 684 (1961). This challenge is premised on the fact that the parties cannot expect an arbitration award "approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them." Stamford v. Stamford Police Assn., supra, 259; Board of Trustees v. Federation of Technical College Teachers, supra, 195. When a challenge to the arbitrator's authority is made on public policy grounds, however, the court is "not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award." Board of Trustees v. Federation of Technical College Teachers, supra. Accordingly, the public policy exception to arbitral authority should be narrowly construed and "`[a] court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained `by CT Page 2497 reference to the laws and legal precedents and not from general considerations of supposed public interests.'" United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 43, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); see W. R. Grace Co. v. Rubber Workers, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 798 (1983). . . ." New Haven v. AFSCME, Council 15, Local 530, supra, 417. The party challenging the award "bears the burden of proving that illegality or conflict with public policy is clearly demonstrated." Id. Therefore, given the narrow scope of the public policy limitation on arbitral authority, the plaintiff can prevail in the present case only if it demonstrates that the board s award clearly violates an established public policy mandate. (Footnotes omitted).
As noted by Justice Callahan, there are numerous cases in which our courts have evaluated claims that an arbitrator's award should be vacated as inconsistent with public policy. See, e.g.,Garrity v. McCaskey, supra, 223 Conn. 1 (1992); New Haven v.AFSCME, Council 15, Local 530, supra, 208 Conn. 411 (1988); Boardof Education v. Local 566, 43 Conn. App. 499, 504-506 (1996) (award requiring reinstatement of grievant, who had been convicted of fraudulently diverting union funds, violated public policy); Town of South Windsor v. South Windsor Police Union,41 Conn. App. 649, 654-658 (1996) (trial court properly determined that arbitration award violated public policy by ordering reinstatement of a police officer who had deliberately revealed the identity of a confidential informant); State v. Council 4,AFSCME, 27 Conn. App. 635, 639-41 (1992) (trial court properly found that arbitration award contravened Connecticut's public policy of not countenancing the knowing misappropriation of state funds by state officials or employees); Town of Groton v. UnitedSteel Workers of America, Superior Court, judicial district of New London at New London, Docket No. 544601 (April 23, 1998) (reinstatement of grievant violated clear public policy against embezzlement); Norwalk Board of Education v. AFSCME, Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. CV97-0161740 (March 19, 1998) (application by board of education seeking to vacate award reinstating custodian who was convicted of violation of General Statutes Section 21 a-279(a), prohibiting the possession of drugs within 1,500 feet of a school, denied); Shrader v. Zeldes, Needle Cooper,45 Conn. Sup. 130 (1997) (the public policy exception is a separate. common law basis for contesting an arbitration award independent of the provisions of the arbitration statutes); InternationalBrotherhood of Police Officers v. Windsor, Superior Court, CT Page 2498 judicial district of Hartford-New Britain at Hartford, Docket No. 293957 (July 27, 1984) (award, upholding disciplining of police officer who refused to sign a warrant for an arrest which had not been made by him, vacated as contrary to public policy supporting the honesty of police). See also out-of state and federal cases cited by the state, including AFL-CIO (AFSCME) v. Dept. of Cent.Mgt., 173 Ill.2d 299, 671 N.E.2d 668 (1996) (arbitration award reinstating employee who had falsely stated that she had seen three children in Department of Children and Family Services (DCFS) custody and that they were "doing fine," when they had in fact perished in fire, violated public policy in favor of truthful and accurate reporting by DCFS); Iowa Electric Light andPower Company v. Local Union 204, 834 F.2d 1424 (8th Cir. 1987) (arbitration award ordering reinstatement of nuclear power plant machinist who had been discharged for deliberately disregarding federally mandated safety regulations violated public policy).
A two-step analysis is often employed deciding cases such as this. First, the court determines whether an explicit, well-defined and dominant public policy can be identified. If so, the court then decides if the arbitrator's award violated the public policy. AFL-CIO (AFSCME) v. Dept. of Cent. Mgt., supra,173 Ill.2d 299.
As the Misco case makes clear, it is important that the public policy exception be narrowly construed and confined to situations where the contract as interpreted violates some explicit public policy that is well-defined and dominant, and is to be determined by reference to laws and legal precedents, "and not from general considerations of supposed public interests." It is critical to keep these limitations in mind, so that judges do not confuse their own or a party's personal predilections for public policy, or give an unduly expansive interpretation to what is a public policy.
Sources of the Public Policy
Public policy is established by our constitutions, statutes and legal precedents. South Windsor v. South Windsor PoliceUnion, 41 Conn. App. 649, 658 (1996). A public entity's regulations, practices and procedures do not determine public policy, but they may reflect public policy. Id. See also PhelpsDodge Copper Products Co. v. Groppo, 204 Conn. 122, 128 (1987) (administrative agency's regulations have force of law). The fact that there is no language which prohibits, in precise terms, CT Page 2499 persons who engage in the grievant's conduct from working for the state is not determinative of whether a clear, explicit and dominant public policy exists. No written statement of public policy can be expected to anticipate the myriad situations which arise in everyday life. Although not stated in precise words, policies can be viewed as clear, explicit and dominant by reference to relevant statutes, caselaw, and "the clear dictates of common sense." United States Postal Service v. American PostalWorkers Union, 736 F.2d 822, 825 (1st Cir. 1984) (arbitration award requiring Postal Service to reinstate employee who had been convicted of embezzling postal funds violated public policy and was thus unenforceable.)
In this case, there are various sources for the conclusion that the arbitrator's decision violates a clear, well-defined and dominant public policy prohibiting the continued employment by the state of employees who engage in the sort of racially charged, vulgar and harassing conduct which occurred in the instant case.
1. Relevant Statutory Provisions
First and most important, the conduct which Mr. Frederick admitted to engaging in was in violation of the prohibitions contained in General Statutes Section 53a-183, harassment in the second degree.[4] Whether or not he was convicted of a criminal offense is not the point; he was not, in light of having been granted accelerated rehabilitation after being charged with violating this section. What is pertinent is whether he engaged in conduct which violated the public policy against telephone harassment as embodied in the statute. After initially denying it, in writing, he admitted to having made the call. It is clear, therefore, that he violated subsection (a)(1) of the statute, which makes it unlawful to address someone in or use "indecent or obscene language" by telephone. This subsection by its terms contains no intent requirement. The language he used was undeniably indecent, defined in Black's Deluxe Law Dictionary, Sixth Edition (1990) as "Offensive to common propriety; offending against modesty or delicacy; grossly vulgar, obscene; lewd; unseemly; unbecoming; indecorous; unfit to be seen or heard. It is also apparent that he violated subsection (a)(3) of the statute. That makes it a crime to make a telephone call, whether or not a conversation ensues, in a manner "likely to cause annoyance or alarm," where such a call is made "with intent to harass, annoy or alarm" another person. Viewed in the light most CT Page 2500 favorable to the grievant, the call was unmistakably made with the intent to harass and annoy Senator Penn, as the arbitrator so found.[5]
The violation of the policy embodied in this statute, in and of itself. provided a solid basis to terminate Mr. Frederick. Defendant argues, however, that because harassment in the second degree is only a Class C misdemeanor, it does not reflect a public policy sufficiently weighty or definite to justify vacating the award in this case. See Local 387's, Supplemental Brief in Opposition to State of Connecticut's Application to Vacate, dated January 14, 1999. This argument is unpersuasive. There is no support in the caselaw for the proposition that only felony statutes can embody an explicit, well-defined and dominant public policy. Each case must be judged on its own facts, in light of the public policy issues implicated, regardless of whether a felony or misdemeanor is involved. It is the conduct, not the classification of the conduct, that is central to the inquiry.
In this case, there are numerous aggravating factors which makes the statement and associated conduct particularly egregious and which, collectively, justify termination. They are as follows:
First, the anonymous call itself was both racist and
indecent. If it had been racist or indecent, it would still provide a basis for termination, in light of all of the factors present. The fact that it was both racist and indecent heightens its inherent offensiveness.
Second, the language was uttered by a state employee, from the workplace, during working hours. It is, of course, true that it is often difficult to separate a person's private conduct from his or her work behavior. But no such analysis is required here. In this case, at issue is no mere expression of personal views in the sanctity of one's own home or in private conversation. Rather, this outburst occurred while an on-duty state employee was being paid public funds to perform the public s business.
Third, a state instrumentality — a telephone — was used to convey the racist and vulgar message at issue.
Fourth, the call was anonymous, of course, the maker of such a call is not generally likely to identify himself or herself. CT Page 2501 But using the cloak of anonymity increases the offensive nature of criminal conduct, and heightens its capacity to inflict fear in the recipient, as the law recognizes. See, e.g., General Statutes Section 53-37a, which makes it a crime to commit proscribed actions "While wearing a mask, hood or other device designed to conceal the identity" of the perpetrator.
Next, the grievant was not initially truthful with investigators. He submitted a false, written denial.
Finally, the record is not clear as to the amount of time which elapsed between the end of the rally and the making of the phone call at issue. The arbitrator suggests that the conduct can be explained as the outgrowth of various personal stressors. The implication seems to be that, in light of the grievant' s otherwise undeniably commendable work record, the conduct at issue was somewhat impulsive. This explanation is unconvincing. On the available record, limited though it is, it is equally plausible to conclude that the conduct was somewhat premeditated and that it represented not an impulsive outburst, but the surfacing of a deeply held view.
2. Relevant Regulations
Numerous regulations reflect the policy at issue here. SeeTravelers Ins. Co. v. Kulla, 216 Conn., 390, 399 (1990). They include the following.
DEPARTMENT OF CORRECTION Administrative Directive 2.17,Employee Conduct
 Section 5. Standards of Conduct
A. Each Department employee shall:
 1. Comply with all federal and state laws, regulations and/or statutes, Department and Unit Directives and lawful instructions/orders.
 6. Comply with official notices and roll call and other instructions.
12. Act in a professional manner showing respect to other employees, the public. CT Page 2502
15. Maintain appropriate demeanor at all times.
 16. Be courteous and accommodating in all dealings with the public, to include telephone etiquette.
 18. Cooperate fully and truthfully in any inquiry or investigation conducted by the Department of Correction and any other law enforcement or regulatory agency.
B. The following behavior shall be strictly prohibited:
 1. Any act that jeopardizes the security of the unit, health, safety or welfare of the public, staff or inmates.
 10. Engage in abusive or obscene language, threats and/or intimidating behavior.
 11. Engage in professional or illegal behavior, both on and off duty, that could in any manner reflect negatively on the Department of Correction.
 DEPARTMENT OF CORRECTION Manson Youth Institution, Unit Directive 6.2.1-1, General Post Orders
 19. Institution telephones are for official use only, and conversations must be brief. All personal outside calls must be approved by a supervisor.
 45. Good community relations is essential to a professional organization. As such, a polite, courteous, cooperative attitude must be reflected at all times, on or off duty.
As a guard at the John R. Manson Youth Institution, as the state notes, Mr. Frederick is charged with overseeing the conduct, safe-treatment and incarceration of juvenile detainees. Conn. Gen. Stat. § 18-73. In light of Mr. Frederick's position and the outrageous conduct he ultimately admitted to, the Commissioner of Correction, in his discretion, determined CT Page 2503 that discharge was the only appropriate sanction under these circumstances. It was the commissioner's view that there is no place in the correctional system for an employee who engages in such conduct, on state time and using state facilities. Our Supreme Court has rightly accorded substantial deference to prison administrators dealing with the management and operation of the correctional system. See Washington v. Meachum,238 Conn. 692, 733-34, 680 A.2d 262 (1996) ("[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration.") See also Beasley v. Commmissioner ofCorrection, 50 Conn. App. 421, 426, (1998) (prison administrators are responsible for maintaining order and discipline, and courts afford them great deference in accomplishing this complex and intractable task); Ruiz v. Estelle, 679 F.2d 1115 (5th Cir. 1982) (while courts must enforce the constitutional rights of inmates, they should not become enmeshed in the minutiae of prison operations, or second-guess prison administrators).
3. Relevant Caselaw
There are numerous reported decisions which relate to the issue at hand, either directly or indirectly. See State v.Cummings, 46 Conn. App. 661, 670-674 (1997) (upholding Section 53a-183(a)(3) against attack in light of Supreme Court's decision in State v. Indrisano, 228 Conn. 795 (1994), holding that53a-182(a)(2) was impermissibly vague).
Others include Gormley v. Director, Connecticut StateDepartment of Probation, 632 F.2d 938 (2d Cir. 1980) (Connecticut's telephone harassment statute not unconstitutional as it regulates conduct, not speech); State v. Anonymous,34 Conn. Sup. 689, 695-96 (1978) ("A telephone is not a public forum where, in vindication of our liberties, unreceptive listeners need be exposed to the onslaught of repugnant ideas."). and Statev. Lewtan, 5 Conn. App. 79 (1985). See also State v. Roesch, No. CR94-87735, judicial district of Danbury (June 6, 1995). They also include cases recognizing that the use of racial epithets can support a claim for intentional infliction of emotional distress because the use of such language can involve extreme and outrageous intentional invasions of one's mental and emotional tranquility. See Alcorn v. Anbro Engineering, 468 P.2d 216
(1970); Contreras v. Crown Zellerbach Corp. , 565 P.2d 1173
(1977).
Discussion
CT Page 2504
The conduct at issue here, if undertaken by any state employee, would be entirely unacceptable and grounds for termination. As the plaintiff points out in its supplemental memorandum of January 15, 1999, this case does not concern a private sector employee. The state, charged with enforcing the Fair Employment Practice Act, see Section 46a-51, and combating discrimination wherever it is found, has a special responsibility to lead by example.
In the case of a youth corrections officer, however, the concerns are heightened for practical reasons due to the particular demands of the job. In the best of circumstances, corrections officers work in a stressful environment which requires them to exercise difficult judgments under trying and even dangerous conditions. They are in a position which gives them enormous power and discretion when dealing with detainees, a good percentage of whom are African-Americans and many of whom may be generally unaware of their rights. Additionally, they must interact and work with other corrections officers of all backgrounds. Retaining employees who have engaged in conduct such as grievant's would create security concerns because detainees, and other corrections officers, are certain to become aware of the fact that the correction officer has made the offending remarks. In the absence of a demonstrated need, courts should be extremely reluctant to interfere with the judgments of prison officials on matters relating's to security matters. Washingtonv. Meachum, supra; Beasley v. Commissioner of Correction,50 Conn. App. 421, 426 (1998).
Of course, as already noted, it is true that the line between private conduct and public conduct is often ambiguous and difficult to discern, and that each case must be decided in light of relevant factual circumstances and applicable policy considerations. But here, as noted, there is no ambiguity. Here, to repeat, what is at issue is not a privately held view expressed in a private setting. Here, what is at issue is conduct which occurred at the workplace, while the grievant was on duty, using a state telephone. The grievant, by his own conduct, elevated this case into a matter of public concern. As noted above, the Commissioner of Correction must, within limits imposed by law, have wide discretion to take steps to guard the safety, security and well-being of employees, inmates and the public. Courts should be cautious about limiting the commissioner's discretion. Retaining the services of a corrections officer known CT Page 2505 to have engaged in the instant conduct would unnecessarily introduce an element of uncertainty, and therefore potential danger, into the prison setting. There is no sound reason to require the commissioner to retain the services of someone whose presence poses a potential security problem. In this case, then, the particular security and safety requirements of the prison system are consistent with dominant public policy concerns, as well as the need for the commissioner to uphold minimally acceptable standards of civility at work.
Summary and Conclusion
When all is said and done, this case starkly presents a very fundamental question about what conduct is tolerable when engaged in by a state employee on duty. Unfortunately, the arbitrator's decision minimizes society's overriding interest in preventing conduct such as that at issue in this case from occurring. The arbitrator's decision sends the wrong message — that conduct such as that at issue is not viewed as entirely unacceptable. The arbitrator's decision significantly misapprehends the capacity of words — particularly a racial slur widely acknowledged to be the most offensive epithet in the English language — to degrade, denigrate and dehumanize the victim of such verbal assaults. Coming at the end of this century, following decades of arduous and heroic struggle against racial oppression, it is far too late in the day for such an equivocal message.[6]
Some conduct and accompanying language is so offensive, so outside the bounds of propriety, and so at odds with what the public has a right to expect from an on-duty state employee that termination is warranted to uphold the policy of the state in this arena. A lesser sanction — a progressive sanction, as suggested by the arbitrator — would, very simply, send the message that stress, or poor judgment, or other factors, somehow renders the conduct permissible or excusable. In a case such as this, however, progressive discipline, even if motivated by the best of intentions and even if applied to someone with an excellent work history, misses the point and fails to send the necessary message.
Even in an era when public discourse has coarsened considerably, there is a floor of minimally acceptable conduct dictated by public policy which a state employee may not transgress, at pain of losing the right to work for the state. The anonymous, racist, vulgar conduct and remarks at issue in CT Page 2506 this case — particularly given the aggravating factors present — fall well beneath that floor. The fact that an apology was offered is not really the issue. This case does not turn on the state of relations between the grievant and the victim of his conduct. Rather, it turns on an appreciation of the fact that some conduct is absolutely unacceptable. Moreover, whether or not the victim of such conduct wishes to accept an apology is entirely up to the victim, and no one else. In any event, as it has often been noted, words, once uttered, cannot be recalled. Neither can the deep wounds inflicted by their assaultive use be erased by a simple apology. The state' s response to incidents like this must not be susceptible to an interpretation that the state, in any way, condones what occurred.
I conclude that the arbitrator's award violates an explicit, well-defined and dominant policy of the state warranting the termination of employees who engage in behavior such as the grievant's, which is wholly incompatible with continued employment by the state. Anything less than termination is not sufficient to uphold this important policy. For all of the reasons stated above, the state s application to vacate is therefore granted.
___________________________ Douglas S. Lavine Judge, Superior Court